Barbara Ann ALLEY and W.H. Alley, Plaintiffs-Appellants, Cross-Appellees,

v.

GUBSER DEVELOPMENT COMPANY, National Gypsum Company and Weyerhaeuser Company, Defendants-Appellees, Cross-Appellants.

Nos. 83–2415, 83–2423 and 83–2424.

United States Court of Appeals, Tenth Circuit.

March 3, 1986.

John S. Evangelisti (Karen V. Hendrick with him, on briefs), of LaFond & Evangelisti, Denver, Colo., for plaintiffs-appellants.

Hugh Q. Gottschalk (Robert E. Benson and Anne J. Castle, with him, on briefs), of Holland & Hart, Denver, Colo., for defendants-appellees Gubser Development Co. and Nat. Gypsum Co.

Lawrence W. Treece, of Bender & Treece, P.C., Denver, Colo., for defendant-appellee Weyerhaeuser Co.

Before BARRETT, McWILLIAMS and ANDERSON, Circuit Judges.

BARRETT, Circuit Judge.

Gubser Development Company (Gubser), National Gypsum Company (NGC), and Weyerhaeuser Company (Weyerhaeuser) appeal from a final judgment, 569 F.Supp. 36 (1983), entered in favor of Barbara Ann and W.H. Alley (Alleys). The Alleys cross-appeal on the remitted judgment. Neither Weyerhaeuser nor NGC[1] challenge the compensatory damages awarded the Alleys. However, both Weyerhaeuser and NGC challenge the punitive damages awarded to Mr. Alley. The Alleys cross-appeal, challenging the district court's remittitur of punitive damages, denial of attorney fees under the Magnuson-Moss Act, and denial of prejudgment interest.

## FACTS

In April, 1978, the Alleys, after considerable "shopping," purchased a new "American" mobile home from Gubser d/b/a Best Mobile Homes (Best). At the time Best was a dealer for NGC, the manufacturer of the home. The home was built April 24, 1978, in accordance with a special order placed by Best with NGC on behalf of the Alleys. The Alleys moved into the home on April 27, 1978. Immediately after occupying the home the Alleys were bothered by an odor which burned and stung their eyes, noses, and throats. The Alleys complained to Best employees who related that the odor came from formaldehyde releasing products in the home, that the Alleys should "air-out" the home, and that the smell would go away.

Although the smell did not go away, the Alleys continued to reside in the home throughout the summer months. During this time the Alleys made a number of complaints to Best and others about the smell in their home. The Alleys were also treated by several doctors for various ailments, including Mr. Alley's treatment for hepatitis.

In August of 1978, the Alleys decided to move to Denver, Colorado, and soon there-

1. NGC, having early on assumed Gubser's de-   fense, appealed on behalf of Gubser and itself.

after the Alleys arranged to have their home moved to Colorado. After relocating in Colorado, the Alleys fell behind on their home payments. They filed for bankruptcy and vacated the home on November 18, 1978.

On July 25, 1980, the Alleys brought suit against Gubser, NGC, and Weyerhaeuser,[2] seeking damages for permanent personal injuries and property loss as a result of exposure to formaldehyde gas in their home. The Alleys' complaint raised claims of enterprise liability, strict liability, negligence, breach of warranty, and alleged violations of the Consumer Product Safety Commission Act, the National Manufactured Home Construction and Safety Standards Act and the Magnuson-Moss Warranty Act.

## TRIAL

At trial, which extended over two weeks, the Alleys testified in detail relative to the problems created by the odor in their home and their attempts to have the problem corrected. Clarence Lott, a chemist for the Colorado Department of Health testified for the Alleys. He stated that products containing urea-formaldehyde can "off-gas" low levels of formaldehyde, and that at the time the air was tested in the Alleys' home, formaldehyde levels between .49 and .97 parts per million (ppm) were detected. Lott did not identify the source of formaldehyde in the home.

Dr. Beall, a board certified toxicologist, also testified as an expert for the Alleys. Dr. Beall testified, *inter alia:* there is a wide variability of individual sensitivity to formaldehyde; various wood products, including particle board, can off-gas formaldehyde; reports as early as 1905 discussed the effects of formaldehyde on people; and that in the 1970's there was information produced and circulated by "industry" on ways to mitigate or decrease the levels of formaldehyde that may be irritating to a person owning a mobile home. Although

Dr. Beall did not define what he meant by "industry," the court allowed him to testify that, in his opinion, "industry" should have warned the public of the effects of formaldehyde.

The Alleys also presented the testimony of Edna Conyers who purchased the mobile home in October, 1979, less than one year after the Alleys vacated it. She testified that the home had an odor when she first moved into it but that "after you live in there a while, cooking odors and smoke and things like that kind of mask it (odor)." R., Vol. XVI at 736. She did not indicate any dissatisfaction with the home.

During trial Weyerhaeuser stipulated that it produced the paneling in the Alleys' home, that the paneling was produced from plywood *"blanks,"* and that the adhesive used to glue the *"blanks"* together included urea-formaldehyde. Weyerhaeuser acknowledged that during the first four months of 1978, it sold particle board to the plant that built the Alleys' home and that all of the particle board it sold to the plant was purchased from Louisiana Pacific.

Throughout the trial the defendants defended on the basis that although they were aware of the odor related problems with formaldehyde, they were unaware of the serious health related problems as alleged by the Alleys. The defendants introduced the testimony of Dr. Kornberg, who stated that none of Mr. Alley's medical problems "can be related to his formaldehyde exposure at that time," and that "the exposure was insufficient to cause any permanent damage of any sort; and the substance is not known to cause problems at this concentration beyond a very short period." *Id.* at 996.

The trial court admitted several exhibits proffered by the Alleys to which NGC and Weyerhaeuser vigorously objected. First, NGC objected to Plaintiffs' Exhibits 136 and 137 which detailed the odor problems encountered by a purchaser of an Ameri-

---

**2.** Neither Georgia Pacific nor Louisiana Pacific who were subsequently joined as parties are before us on appeal.

can mobile home in November, 1969. While stipulating to the authenticity of the letters, NGC argued that the letters were unsubstantiated and overly prejudicial because they contained the statement that the odor in the home nauseated the owner, who was pregnant, and that her doctor had suggested that she stay somewhere else during the last month of her pregnancy.

Second, Weyerhaeuser also vigorously objected to the court's admission of Plaintiffs' Exhibits 266, 302, 320, 352, and 331. These exhibits, which were obtained from Weyerhaeuser files, discussed formaldehyde odor problems emanating from particle board and the need to correct the problem. Although Weyerhaeuser acknowledged the fact that the exhibits came from its files and "appeared" to be on Weyerhaeuser's stationary, Weyerhaeuser argued that the documents were irrelevant because they all related to particle board and not to paneling; thus, because it did not manufacture any of the particle board in the Alley home, but only the paneling, the exhibits were inadmissible.

Prior to admitting the exhibits, the trial court specifically ruled that Weyerhaeuser could not be held liable on an enterprise theory on the particle board:

> THE COURT: Well are you going to have any evidence to connect it up—no, I don't think we can connect it up, because you haven't told me where in the complaint the allegation is. There is simply no enterprise liability theory against Weyerhaeuser on the particle board in your complaint.
>
> *    *    *    *    *    *
>
> That is the court's opinion; and I think that is very clear in the complaint, and there is just no allegation of enterprise liability against Weyerhaeuser on the particle board.

The court will rule that that is not the case. R., Vol. XX at 1125–1126. Inasmuch as Louisiana-Pacific had manufactured the particle board in the Alleys' home, Weyerhaeuser was dismissed on an enterprise liability theory with respect to the particle board. However, Weyerhaeuser remained in the case with respect to particle board on claims of implied breach of warranty, products liability, and negligent failure to warn.

## MOTIONS FOR DIRECTED VERDICT

Approximately midway through presentation of their defense, Weyerhaeuser and NGC moved for directed verdicts. In arguing for a directed verdict dismissing all the Alleys' claims against it, Weyerhaeuser contended that there was insufficient evidence to support a finding that its paneling in the Alley home had off-gassed, much less that it off-gassed to an extent sufficient to create the injuries of which the Alleys *complained.* (R., Vol. XXI at 1358–1359.) Weyerhaeuser further argued for a directed verdict on all claims for punitive damages on the basis that although the evidence established "an awareness of an odor problem," there was "no evidence that Weyerhaeuser knew that the paneling could cause physical harm to people and acted with a wanton and reckless disregard of the harm to people that might be caused by disregarding that concern." *Id.* at 1365.

NGC moved for a directed verdict by incorporating Weyerhaeuser's motion in total. *Id.* at 1378. In its motion for a directed verdict on Alleys' punitive damage claim, NGC argued, *inter alia:* Alleys' complaints were directed to an odor problem; the Alleys did not make health related complaints and did not relate any serious problems to Best or NGC; although Best and NGC may not have properly responded to the Alleys' complaints about smell in the home, which gave rise to the level of negligence, there is no evidence that the actions of Best and NGC gave rise to willful and wanton conduct supportive of punitive damages. *Id.* at 1380–86.

Prior to ruling on Weyerhaeuser's and NGC's motions for a directed verdict, the district court observed:

> It has been pointed out in the arguments by defendants what the plaintiff could have done and what they have not done in making a presentation in this case. Normally in a products liability

case, there is an expert witness who specifically says this product is defective in that expert's opinion and why it is defective. We have not had such an expert in this case. I don't know what the problem has been. From the literature that I have looked at, including all the exhibits that haven't come in, it looks like there surely should have been such an expert to testify; but the closest we've come is Dr. Beall, who really didn't testify in at any length about wood product and specifically did not testify about any testing he did on the floor board or the wall paneling.

However, the Court certainly has to consider inferences—reasonable inferences, circumstantial evidence, and try to make this decision as fair as we can at this point to the Plaintiff; and when the Court is in doubt, which I am on a couple areas, I will resolve those doubts by letting it go to the jury.

R., Vol. XXII at 1449–50.

Thereafter the district court granted NGC's and Weyerhaeuser's motions for a directed verdict on the following claims: *Magnuson-Moss*, because "there is no evidence of any damage to property or direct damage in this case" (R., Vol. XXII at 1450); *impaired earning capacity*, "there is no reasonable inference that can be drawn that he has impaired earning capacity ... nor is there any evidence of permanent physical injury," *id.* at 1450–1451; *lost reputation*, "no ... evidence that the plaintiffs have lost their reputation in any way" *id.*; *lost credit*, "no evidence of impaired credit" *id.* at 1452; and *enterprise liability*, "is no longer in the case" *id.* However, the court denied NGC's and Weyerhaeuser's motions for a directed verdict on the Alleys' claims for punitive damages. In so doing, the court, after noting its concern about the claims, found that the claims should remain in the case. The court then ruled that the following causes of action would be presented to the jury: implied warranty of merchantability, product liability, and negligent failure to warn.

After all the parties had rested, the defendants renewed their motions for directed verdicts. (R., Vol. XXIV at 1965, *et seq.*) These motions were denied and the case was presented to the jury. At the time the jury received the case, the Alleys had presented evidence which tended to establish: their purchase of the home; Louisiana Pacific as the manufacturer of the particle board in the home; Weyerhaeuser as the supplier of the particle board and the manufacturer and supplier of wood paneling in the home; the *presence* of formaldehyde in the home (without identifying the *source* of the formaldehyde); complaints to various individuals and entities about the smell in their home; periods of illness which for both Mr. and Mrs. Alley required medical treatment while residing in the home (yet the Alleys acknowledged that they did not tell their doctors about the formaldehyde); people have different reactions to formaldehyde; moving their home from Oklahoma to Colorado; petitioning for bankruptcy; and vacating the home. The Alleys also acknowledged that Mr. Alley had fully recovered from his hepatitis.

The defendants had presented evidence which tended to establish that: they were aware of smell related problems caused by formaldehyde but not health related problems as alleged by the Alleys; the Alleys' health problems during the time they resided in the home were not related to the formaldehyde in the home; Mr. Alley could not have recovered from his hepatitis, had it actually been formaldehyde induced, because he continued to live in the home during his recovery (which was unrebutted); and that the Alleys did not have to file for bankruptcy but did so on the erroneous advice of their attorney.

The jury returned a verdict in favor of the Alleys and awarded: $20,000.00 in compensatory damages to Mrs. Alley; $30,000.00 in compensatory damages to Mr. Alley. The jury also awarded punitive damages to Mr. Alley against: Gubser in the amount of $10,000.00; NGC in the amount of $200,000.00; Weyerhaeuser in

the amount of $150,000.00; and Louisiana-Pacific in the amount of $150,000.00.

## POST–TRIAL MOTIONS

The defendants filed three post-trial motions. Gubser and NGC moved for judgment n.o.v. or, in the alternative, a new trial. Louisiana-Pacific moved to alter or amend the judgment, or alternatively for judgment n.o.v., for remittitur or for a new trial. Weyerhaeuser moved for judgment n.o.v. on punitive damages, to alter or amend judgment, or, alternatively, for remittitur or a new trial on all claims.

After a review of the motions and memoranda, the court entered an order upholding the compensatory damage awards and remitting the punitive damage awards. In upholding the compensatory damages awarded to the Alleys the court, after quoting from *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152 (10th Cir.1983), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983), ruled that although the evidence was largely circumstantial, there was evidence to support a finding that there was urea-formaldehyde in the Alleys' home and that it caused injury to the Alleys.

In remitting the punitive damages awarded to Mr. Alley from $510,000.00 to $150,000.00, the court found:

> The purpose of punitive damages is to punish the wrongdoer and to deter similar conduct in the future and by others. *Frick v. Abell*, [198 Colo. 508] 602 P.2d 852, 853–54 (Colo.1979). Several factors must be taken into consideration in determining whether an award of punitive damages is excessive: (1) whether it bears some reasonable relation to the actual damages awarded; (2) the degree of malice involved; (3) the gravity of the plaintiff's injury; (4) the desire for meaningful punishment. *Taylor v. Sandoval*, 442 F.Supp. 491 (D.Colo.1977). The Court in *Taylor* found that there is no precise mathematical ratio for determining the reasonableness of the punitive damage award. However, it has been held in the Tenth Circuit that an award

of punitives can be "[s]o extremely disproportional that we must assume that the jury acted either with passion or prejudice...." *Dearmore v. Gold*, 400 F.2d 887, 888 (10th Cir.1968). In the *Dearmore* case, a ratio of punitive to compensatory damages of 11:1 was struck down as being excessive.

> The award of punitive damages to Mr. Alley was $510,000.00. Mr. Alley was found to have suffered $30,000.00 in actual damages, and Mrs. Alley, $20,000.00. The ratio of punitive to compensatory damages for Mr. Alley is 17:1. Even if the compensatory awards are combined, the ratio of punitive to actual damages is greater than 10:1.

> This Court finds this to be a disproportion that is "so excessive ... as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice ... or other improper cause invaded the trial." *See Barnes v. Smith*, 305 F.2d 226, 228 (10th Cir.1962). *See also Malandris, supra*, at 30.

> In so finding, the Court has considered the many factors set out by the Colorado courts as they apply to this case: the extent of the plaintiffs' harm was not so great as to merit an extremely high punitive award; the award of punitives was not reasonably related to the compensatory damages; the plaintiffs did not prove a high degree of malice on the part of the defendants.

> The punitive damage award will therefore be reduced, in order to effect a more reasonable relationship between the compensatory and punitive damage awards and yet not defeat the purpose behind the punitive awards. The defendants must still be made to feel the "sting" of the jury's finding that they acted with a wanton and reckless disregard of the plaintiffs' rights and feelings. The punitive award must retain its deterrent effect.

R., Vol. IV at 768–69. The judgment, as remittited was accepted "under protest" by the Alleys.

## ISSUES

### I.

Weyerhaeuser and NGC contend the evidence is insufficient to support an award of punitive damages and the district court erred in denying their motions for a directed verdict on the punitive damages claim. We agree and hold that the district court erred in submitting the issue of punitive damages to the jury.

In Colorado exemplary damages are a creature of statute. *Mince v. Butters,* 200 Colo. 501, 616 P.2d 127, 128 (1980). Exemplary damages may be recovered under section 13–21–102, C.R.S.1973, which provides as follows:

> In all civil actions in which damages are assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.

The standard of proof to recover exemplary damages is also prescribed by statute. "Exemplary damages ... shall only be awarded in a civil action when the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in section 13–21–102...." C.R.S.1973 § 13–25–127(2). Therefore, in order to recover exemplary damages under Colorado law, the plaintiff must prove beyond a reasonable doubt that the injury inflicted by the defendant was "attended by circumstances of fraud, malice or insult, or a wanton or reckless disregard" of the plaintiff's rights and feelings.

In cases properly involving punitive damage claims, it is within the province of the jury to determine the proper amount of punitive damages. The question of the sufficiency of evidence to justify an award of exemplary damages, however, is a question of law for the court. *Mince v. Butters,* 616 P.2d 127–29 (Colo.1980). For instance, in disposing of a motion for a directed verdict on a punitive damage claim, the Colorado Supreme Court has held that the district court must determine whether, viewing the evidence in a light most favorable to the plaintiff, "a reasonable jury could find beyond a reasonable doubt that [defendant's] injury-causing conduct was 'attended by circumstances of fraud' or a 'wanton and reckless disregard of the injured party's rights and feelings' as provided in section 13–21–102." *Palmer v. A.H. Robins, Co.,* 684 P.2d 187, 218 (Colo.1984). In our view there is no evidence in the record from which a reasonable jury could find such conduct.

The defendants in this case were found liable under one or more theories for the injuries sustained by the plaintiffs, as evidenced by the jury's award of compensatory damages. There is, however, no evidence in the record to show that the defendants' conduct should be punished or deterred. "Conduct which is merely negligent cannot serve as a basis for a punitive damage award." *Sunward Corp. v. Dunn & Bradstreet,* 568 F.Supp. 602, 608 (D.Colo.1983), citing *Frick v. Abell,* 198 Colo. 508, 602 P.2d 852 (Colo., 1979). Nor can selling a product in a condition unreasonably dangerous to the user or consumer under section 402A of the *Restatement (Second) of Torts* serve as the sole basis for a punitive damage award. Damages are awarded under either a negligence or a strict liability claim to compensate the plaintiff for actual losses. In contrast, "[a] punitive damages claim ... is calculated to punish wrongful conduct and to deter a repetition of that conduct." *Palmer v. A.H. Robins, Co.,* 684 P.2d at 217–18.

■ Upon review of the record it appears that plaintiffs base their punitive damage claim on defendants' "conduct" of constructing mobile homes with wood products containing formaldehyde which plaintiffs allege was in wanton and reckless disregard of their rights. See, *Malandris v. Merrill Lynch, Pierce, Fenner and Smith,* 703 F.2d 1152, 1177 (10th Cir.1981),

*cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983) (nature of the act which caused the injury is to be considered.) The Colorado Supreme Court has defined the phrase "wanton and reckless disregard" in the exemplary damage statute as follows: "If, conscious of his conduct and the existing conditions, he [defendant] knew or should have known, that the injury would *probably* result, the requirements of the statute are met." *Foster v. Redding,* 97 Colo. 4, 45 P.2d 940–41 (1935) (emphasis added). The record fails to establish that the defendants did anything other than conform to industry standards in producing the wood products and in constructing the mobile home. Therefore under the plaintiffs' theory, the "wrongful conduct" sought to be deterred is the mobile home industry's practice of constructing mobile homes with wood products containing formaldehyde.

The evidence admitted at trial shows the defendants had knowledge that formaldehyde caused unpleasant odors and minor irritation when it off-gassed from their wood products. Evidence against Weyerhaeuser was introduced showing that employees at the wood products' plant experienced some of these symptoms. In addition, an internal report was offered to show that Weyerhaeuser knew these symptoms were caused by formaldehyde. Evidence introduced against NGC consisted of several letters written by one customer over a period of time in which the customer complained of odors and irritation. The evidence admitted also showed that these problems can usually be alleviated with minimal ventilation or certain other precautions. Customer and employee complaints regarding off-gassed formaldehyde are infrequent and are easily resolved by remedial measures.

In submitting the issue of punitive damages to the jury, the district court would have to conclude that a reasonable jury could find that the industry's use of wood products containing formaldehyde is a wanton and reckless disregard of the plaintiffs' rights such that defendants knew or should have known it would *probably* cause the plaintiffs' injury. There is simply no evidence in the record to support such a finding, which in effect would determine that the industry's practice of using these wood products in mobile homes is unreasonable *per se.* The only evidence in the record to support such a finding consists of a few isolated consumer complaints regarding odors and minor irritation. This simply falls short of the evidence required to show that injury would *probably* result from defendants' conduct.

Applying these standards, we must hold that the district court erred in denying NGC and Weyerhaeuser's motions for a directed verdict on punitive damages and permitting the issue to go to the jury. Viewing the evidence in a light most favorable to the plaintiffs and drawing all reasonable inferences to support the verdict, we cannot hold that a reasonable jury could find beyond a reasonable doubt that defendants' conduct was a "wanton and reckless disregard of the injured party's rights and feelings" as required under section 13–21–102.

## II.

In their cross appeal, the Alleys challenge the district court's remittitur of punitive damages, denial of attorneys' fees under the Magnuson-Moss Act, and the denial of prejudgment interest. The Alleys contend that they have the right to appeal the remittited judgment, including the court's remittitur of punitive damages, denial of attorney's fees under the Magnuson-Moss Act, and the denial of prejudgment interest which they accepted under protest. The defendants contend that the Alleys' acceptance of the remittitur waives their objections to the judgment entered and precludes them from raising them on cross-appeal.

■ In its Order, the district court ruled as follows with respect to the remittitur: "Plaintiffs will have 20 days from the date of this Order in which to accept or reject the remittitur. If they choose to reject the remittitur, *a new trial will be ordered on*

*all issues,* because a trial on the issue of punitive damages alone would create undue confusion." (Emphasis added.) We hold that the district court's remittitur embraced all issues considered in the case and that the Alleys' acceptance of the remittited judgment waives their right to appeal these issues.

A party cannot accept a remittitur "under protest" and thereby appeal matters otherwise not appealable. Challenges similar to the Alleys, in which parties have attempted to appeal remittited judgments accepted under protest, have been repeatedly rejected. In *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 649–50, 97 S.Ct. 835, 836–37, 51 L.Ed.2d 112 (1977) the Court succinctly stated:

The Court of Appeals properly followed our precedents in holding that a plaintiff cannot "protest" a remittitur he has accepted in an attempt to open it to challenge on appeal. A line of decisions stretching back to 1889 has firmly established that a plaintiff cannot appeal the propriety of a remittitur order to which he has agreed. *Kennon v. Gilmer,* 131 U.S. 22, 29–30 [9 S.Ct. 696, 698–99, 33 L.Ed. 110] (1889); *Lewis v. Wilson,* 151 U.S. 551, 554–555 [14 S.Ct. 419, 420–21, 38 L.Ed. 267] (1894); *Koenigsberger v. Richmond Silver Mining Co.,* 158 U.S. 41, 52 [15 S.Ct. 751, 756, 39 L.Ed. 889] (1895); *Woodworth v. Chesbrough,* 244 U.S. 79, 82 [37 S.Ct. 583, 584, 61 L.Ed. 1005] (1917).

There are decisions in the Federal Courts of Appeals that depart from these unbroken precedents. Those decisions held or intimated that a plaintiff who accepts a remittitur "under protest" may challenge on appeal the correctness of the remittitur order.

\* \* \* \* \* \*

The proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is, however, a matter of federal law, see *Hanna v. Plumer,* 380 U.S. 460, 466–469 [85 S.Ct. 1136, 1141–42, 14 L.Ed.2d 8] (1965); *Byrd v. Blue Ridge Rural Electric*

*Coop.,* 356 U.S. 525 [78 S.Ct. 893, 2 L.Ed.2d 953] (1958), and that law has always prohibited appeals in the situation at bar. The Court of Appeals for the Second Circuit correctly adhered to the consistent rule established by this Court's decisions. In order to clarify whatever uncertainty might exist, we now reaffirm the longstanding rule that a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted.

*See also Dumbell Ranch Co., v. Cherokee Exploration, Inc.,* 692 F.2d 706, 709 (10th Cir., 1982) ("a party in federal court, whether his claim is based on federal or state law, may not appeal from an order of remittitur he has accepted"). We hold that the Alleys, having accepted the remitted judgment under protest, cannot now appeal the court's remittitur of punitive damages or denial of attorney fees and prejudgment interest.

REVERSED AND REMANDED.