**Jim GRUNTMEIR, Plaintiff–Appellee,**

v.

**MAYRATH INDUSTRIES, INC., Defendant–Appellant.**

**No. 86–1321.**

United States Court of Appeals, Tenth Circuit.

March 14, 1988.

---

John Gehlhausen, Lamar, Colo., for plaintiff-appellee.

Hal B. Warren of Weller, Friedrich, Hickisch, Hazlitt & Ward, Denver, Colo., for defendant-appellant.

Before McKAY, BARRETT and TACHA, Circuit Judges.

BARRETT, Senior Circuit Judge.

Appellant Mayrath Industries, Inc. (Mayrath) seeks reversal of a jury verdict and judgment in favor of Jim Gruntmeir (Gruntmeir) for severe personal injuries caused by a grain auger manufactured and distributed by Mayrath in 1975 or 1976. In 1982, Gruntmeir caught his arm on bolts protruding from a spinning drive shaft on a Mayrath grain auger while in the course of his employment with Temple & Esgar, a grain elevator company. Tempel & Esgar, covered by the immunity provision of the Colorado Workmen's Compensation Act,[1] purchased the grain auger from an individual named Maurice Ure. Ure was a third-

party defendant until sometime prior to trial and is not a party to this appeal.

The jury found Gruntmeir ten percent at fault, Mayrath sixty percent at fault, and Ure thirty percent at fault. The court reduced the total damages of $250,000 by the ten percent of fault attributable to Gruntmeir. The amount of compensatory damages is apparently not in issue. However, the jury's award of $50,000 in exemplary damages against Mayrath is disputed. Mayrath contends that there was insufficient evidence of the conduct required to impose exemplary damages, and that the court should have directed a verdict in its favor both as to exemplary damages and as to its affirmative defense of assumption of risk. Further, Mayrath argues that the trial court erred in refusing to join Tempel & Esgar as third-party defendants. A recitation of the evidence as elicited at trial is required to put these issues into context.

## FACTS

A grain auger is a tube-like machine used generally to transfer grain from a truck into a grain bin or out of a bin into a truck. There were several feasible and economical designs for grain augers in 1975 and 1976, when the auger in question was manufactured, including augers with top and side drive shafts. The auger in this case was a bottom-drive auger, which could be manufactured more cheaply than a top-drive auger (R., Vol. III, p. 137). As the name suggests, a bottom-drive auger has its drive shaft at the bottom of the tube, closer to where workers are likely to be plying shovels.

As manufactured, this auger had a shield over the drive shaft to prevent inadvertent contact with the drive shaft. The evidence also suggested that the original bolts holding the drive shaft together did not protrude from the drive shaft, although this evidence was inconclusive. At the time of Gruntmeir's accident, the shield over the drive shaft had been removed either by Ure, the first owner, or by Tempel & Es-

---

1. Colo.Rev.Stat. § 8–42–102 (1973).

gar. The bolts protruded by approximately one quarter of an inch.

When Gruntmeir was injured, he was assisting a fellow employee in moving grain from trucks into bins at Big Bend, Colorado. As they were emptying the last truck on November 9, 1982, Gruntmeir somehow caught his right arm on the bolts protruding from the spinning drive shaft of the Mayrath auger and nearly lost his arm. The evidence conflicted on whether Gruntmeir was reaching over the auger for the shovel he and his fellow employee were sharing, or whether he inadvertently backed into the drive shaft and was caught. There was a warning decal on the auger concerning operating it with missing shields, but one expert testified that caution signs would normally be read only at a worker's first exposure to a new machine. (R., Vol. V, p. 399.) The accident occurred at the end of Gruntmeir's second day of use of this auger. Moreover, the decal was covered with dirt and grease (R., Vol. III, p. 104), and Gruntmeir testified without contradiction that he had worked on farms and around farm equipment all of his life and that grain augers commonly had their safety guards removed. (R., Vol. IV, pp. 277–78.)

A number of experts testified for both parties. One of Gruntmeir's two experts testified that damage to and removal of the drive shaft shield in a bottom-drive auger is inevitable (R., Vol. III, p. 141), and that Mayrath dealers do not stock extra guards (R., Vol. III, p. 142). Moreover, he asserted that this particular auger, although cheaper to manufacture, is dangerous because of the likelihood of damage to the drive shaft shield from trucks (R., Vol. III, pp. 147–48) because the drive shaft shield was not designed to withstand any kind of blow from a truck (R., Vol. III, pp. 149–50). The witness opined that the guard should have been strong enough to damage the drive shaft and render the auger inoperable if the guard were demolished (R., Vol. III, p. 150), or there should have been an interlock mechanism. Such mechanisms had been available since the early 1960's (R., Vol. III, pp. 148–49). The witness also testified that there were efficient ways to attach the gear box to the drive shaft without protruding bolts (R., Vol. III, p. 165), although it was unclear from the evidence whether or not the auger came from the factory with protruding bolts.

Gruntmeir's second expert witness testified that accident prevention was an engineering problem and that designers of machinery must expect and allow for human error (R., Vol. V, p. 374). He asserted that designs safer than the bottom-drive auger had been known since before 1975 (R., Vol. V, p. 381). He also testified there was considerable literature indicating safety guard removal was a common problem (R., Vol. V., p. 383), and that one well-known study found that fifty percent of all grain auger accidents involved a missing safety guard (*Id.*). The witness concluded that it was forseeable that the guard on the grain auger in question would be removed (R., Vol. V, p. 386) and that the common farm worker would have no appreciation by training and experience of how quickly he could be caught on an unshielded drive shaft and how rapidly serious injury would occur (R., Vol. V, p. 388). The guard used by Mayrath was inadequate (R., Vol. V, pp. 390–91), and Mayrath should have known the guard would be removed and not replaced (R., Vol. V, p. 396).

Mayrath's president, Edward Appleby, testified on cross-examination that Mayrath did not comply with recommendations made in 1970 by the National Safety Council regarding the shielding of equipment (R., Vol. VI, p. 546). Mayrath did not obtain the advice of insurance company safety engineers, state factory inspectors or local safety council engineers regarding the design of the guard over the drive shaft (*Id.*), nor did Mayrath test the guard on the bottom-drive auger since it was the same as the one they had used on the top-drive auger (R., Vol. VI, p. 550). Appleby admitted that if a guard were damaged in the harvest process, there was a good chance the harvest would be completed without the guard on the machine (R., Vol. VI, p. 558). Appleby also testified that he knew in 1975 through 1977 that farm worker injuries as a result of contact with grain

augers were a serious problem and that the drive shaft was one of the most dangerous areas of a grain auger (R., Vol. VI, p. 559–60). He further testified that he knew that a grain auger with a guard on it that has a reasonable probability of being removed is dangerous to farm workers (R., Vol. VI, p. 563). Despite this, Appleby testified that Mayrath had no definite plans to change the design of the auger (R., Vol. VI, p. 561).

## I.

### Exemplary Damages

Mayrath contends that this evidence, even when viewed in a light most favorable to the plaintiff, as we have done in reciting it, is insufficient as a matter of law on the issue of exemplary damages. Mayrath asserts that the court should have granted its motion for directed verdict as to this issue and should not have submitted it to the jury.

█ In considering a motion for directed verdict, the trial court in a diversity case must view the evidence and the inferences to be drawn therefrom in the light most favorable to the party against whom the motion is directed. *Peterson v. Hager,* 724 F.2d 851, 853–54 (10th Cir.1983). When the evidence is so viewed, a directed verdict is proper only when the evidence is so patently in favor of the moving party that a jury verdict in favor of the opposing party would be improper and would have to be set aside by the trial judge. *Id.* It is, of course, the court's task to decide whether there is sufficient evidence to justify a finding of exemplary damages. *Alley v. Gubser Development Co.,* 785 F.2d 849 (10th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986).

█ Exemplary damages are available only pursuant to statute in Colorado. *Kaitz v. Dist. Court,* 650 P.2d 553 (Colo. 1982). Colo.Rev.Stat. § 13–21–102 (1973) provides as follows:

> In all civil actions in which damages are assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings, the jury, in addition to actual damages sustained by such party, may award him reasonable exemplary damages.

█ The elements necessary for an award of punitive damages must be established beyond a reasonable doubt. *Frick v. Abell,* 198 Colo. 508, 602 P.2d 852 (1979). Further, there must be evidence that the act causing the injuries was done with an evil intent and with the purpose of injuring plaintiff or with such a wanton and reckless disregard of plaintiff's rights as to evidence a wrongful motive. *Id.* "Wanton and reckless" disregard in the context of exemplary damages has been defined as "conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences." *Tri-Aspen Const. Co. v. Johnson,* 714 P.2d 484, 486 (Colo.1986), citing *Palmer v. A.H. Robins Co.,* 684 P.2d 187, 215 (Colo.1984).

█ We have reviewed the record in its entirety. Although we may not have reached the same conclusion the jury did, we cannot hold that the trial court erred in refusing to grant a directed verdict in Mayrath's favor. We cannot hold that the evidence is so patently in favor of Mayrath that a jury verdict in favor of the plaintiff was improper. Mayrath's president knew that the bottom-drive auger was likely to be used with its drive shaft unshielded, thus creating an unreasonable hazard to farm workers. There is evidence the bottom-drive grain auger was less expensive to manufacture than the top-drive version Mayrath had previously been marketing. Most significantly, there is evidence that Mayrath's management knew that accidents exactly like the one in this case were common among agricultural workers. And there is evidence that safer designs were available and technically feasible. In short, there is evidence in the record supportive of the jury's finding that Mayrath acted with wanton and reckless disregard of the plaintiff's rights. We hold that the

district court did not err in refusing to direct a verdict for Mayrath.

In so holding, we are not unmindful of two cases recently decided by this court wherein punitive damages awards were reversed. In *Alley v. Gubser*, 785 F.2d 849 (10th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986), we reversed an award of punitive damages where plaintiffs had sued alleging they were harmed by formaldehyde gas emitted by the paneling in their mobile home. There we observed:

> The record fails to establish that the defendants did anything other than conform to industry standards in producing the wood products and in constructing the mobile home. Therefore, under the plaintiff's theory, the 'wrongful conduct' sought to be deterred is the mobile home industry's practice of constructing mobile homes with wood products containing formaldehyde. *Id.* at 856.

We concluded that a finding in plaintiff's favor would amount to a finding that the use of these wood products in mobile homes was unreasonable *per se*, and that the record would not support such a finding.

In *Juarez v. United Farm Tools*, 798 F.2d 1341 (10th Cir.1986), we reversed a punitive damage award in a case superficially similar to this one. There, an agricultural worker was injured by a spinning auger while cleaning out a grain cart. The auger and the grain cart were a single piece of machinery. We held that although the evidence established beyond a reasonable doubt that users of the grain cart faced a substantial risk of harm and that the defendant was aware of the risk, the evidence failed to establish that the defendant "disregarded the consequences" of the danger posed by the running auger. *Id.* at 1343. What distinguishes *Juarez* from the instant case is that in *Juarez*, "the defendant had no indication that the warning [not to enter the grain cart while the auger is running] was ineffective, for Juarez concedes that there had been no reports of prior similar accidents." *Id.* at 1344.

This is in contrast to the instant case, where there was evidence that accidents such as Gruntmeir's were common and that Mayrath's management knew this. In *Juarez*, there was no evidence that the defendant knew or should have known that its warning to keep out of the grain cart was ineffective, whereas in the instant case Appleby admitted he knew the shield over the drive shaft was likely to be removed and once removed was ineffective to prevent injury. Moreover, there had been numerous similar accidents over the years involving unshielded drive shafts. Thus, we conclude that the evidence in the instant case was sufficient to establish beyond a reasonable doubt that 1) there was a substantial risk of harm to users of the Mayrath grain auger, 2) Mayrath's management was aware of the risk, and 3) Mayrath disregarded the consequences of the risk by continuing to market the bottom-drive auger with a shield that was likely to be removed.

## II.

### Assumption of Risk

■ Mayrath contends that a verdict should have been directed in its favor on the issue of assumption of risk. Mayrath argues that assumption of risk is a valid affirmative defense pursuant to *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975), and *Good v. A.B. Chance Co.*, 39 Colo.App. 70, 565 P.2d 217 (1977), and that the evidence here established the basic elements of the defense. These elements are: 1) the plaintiff knows the specific danger; and 2) the plaintiff voluntarily and unreasonably proceeds to encounter the specific danger and is thus injured.

As with the issue of punitive or exemplary damages, a directed verdict on this issue would be appropriate only if the evidence is so patently in favor of the moving party that a jury verdict in favor of the opposing party would be improper and would have to be set aside by the trial court. *Peterson v. Hager*, 724 F.2d at 853–54. Mayrath asserts that the manner in which Gruntmeir's accident took place is undisputed and that there was no genuine issue of fact for the

**1042**

jury to decide. Mayrath contends that in reaching across the unguarded drive shaft for a shovel, Gruntmeir assumed the risk of injury because he had worked around such equipment all his life and should have known better. *See, e.g., Tomicich v. Western–Knapp Engineering Co.*, 423 F.2d 410 (9th Cir.1970).

Our perusal of the record indicates that there is in fact no such certainty about how the accident took place. Gruntmeir may have leaned over the drive shaft for a shovel, or he may have backed into the drive shaft and was thus caught. This was hotly contested by the parties and was something only the jury could decide. Moreover, the jury was properly and fully instructed as to the elements of assumption of risk. (R., Vol. VIII, p. 1029.) We find no error in the court's refusal to direct a verdict on this issue.

### III.
#### *Joinder of Employer as Party*

The trial court thwarted Mayrath's efforts to join Tempel & Esgar, Gruntmeir's employer, as a third party defendant prior to trial. Mayrath contends this was error because the issue is undecided in Colorado and there are sound policy reasons for allowing such a joinder. Chief among these reasons is the fact that third parties derive no benefit from the "quid pro quo" arrangement between employer and employee.

Since oral argument, the Colorado Supreme Court has, on February 1, 1988, decided *Williams v. White Mountain Construction Co.*, 749 P.2d 423 (Colo.1988), and a companion case, *Tex–Ark Joist Co. v. Derr and Gruenewald Construction Co.*, 749 P.2d 431 (Colo.1988). In both cases, the court refused to recognize a right to contribution between employers and third parties. Thus under Colorado law, the trial court's refusal to allow the joinder of Tempel & Esgar as third-party defendants was proper.

With regard to the argument that Mayrath may be disproportionately liable, or may be liable for conduct that was the fault of Tempel & Esgar, we note that the

Colorado Supreme Court addressed a similar argument in *Williams*. The court said:

Tortfeasors sued by injured employees are now able to present evidence of employer liability at trial so as to reduce whatever damages may be assessed against them to a level proportionate to their liability. The problem of one tortfeasor bearing disproportionate liability has now been eliminated without requiring contribution from negligent employers. (at 427)

In the instant case, Mayrath was permitted to introduce evidence of Tempel & Esgar's negligence to reduce its own liability. Moreover, the trial court instructed the jury that Mayrath claimed the conduct of Tempel & Esgar was the sole cause of Gruntmeir's injuries. (R., Vol. VIII, p. 1022.) If the jury had believed Tempel & Esgar to be partly or solely at fault, it could have exonerated Mayrath.

AFFIRMED.