Stacy BARTHOLIC, Individually, and as natural mother and next friend of her minor children, Jerred Meskimen and Anthony Meskimen, Plaintiffs,

v.

SCRIPTO–TOKAI CORPORATION, a Delaware corporation and Richard D. Grimm and Lana Gallas, also known as Lana Gallas–Grimm, Individually, Defendants.

No. Civ.A. 98 N 681.

United States District Court, D. Colorado.

Jan. 10, 2000.

Order denying motion to vacate, Oct. 11, 2000.

Order denying reconsideration of Jan. 10, 2000 Order, Dec. 14, 2000.

William J. Hansen, McDermott and Hansen, Denver, CO, for plaintiffs.

Robert B. Hunter, James Ernest Hooper, Wheeler, Trigg & Kennedy, PC, Denver, CO, for Scripto-Tokai Corp., defendant.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is a personal-injury case. Plaintiff Jerred Meskimen was severely injured when his three-year old brother, Plaintiff Anthony Meskimen ("Tony"), lit his crib on fire with an "Aim N Flame" utility lighter which Defendant Scripto–Tokai Corporation ("Scripto") manufactures and distributes. Plaintiff Stacy Bartholic, in her individual capacity and on behalf of her minor children, Jerred and Tony, brings claims against Scripto for: (1) strict products liability; (2) negligence; and (3) violations of the Consumer Product Safety Act, 15 U.S.C.A. §§ 2051–2084 (West 1998). This matter is before the court on Scripto's "Motion for Summary Judgment of Scripto–Tokai Corporation" filed April 21, 1999. Jurisdiction is based on 28 U.S.C.A. § 1332 (West 1993 & Supp.1999).

## FACTS

Scripto manufactures and distributes a multi-purpose butane-fueled utility lighter known as the Aim N Flame.[1] (See Scheduling Order, Undisputed Facts ¶¶ 2, 4, 7 [filed July 15, 1998] [hereinafter "Scheduling Order"].) A utility lighter is "a hand-

---

1. In reality, there are three affiliated corporate entities involved in the design, manufacture, and sale of the Aim N Flame. The Tokai Corporation of Japan, Scripto's parent company, performs the design work for the Aim N Flame. JMP Mexico is a Mexican corporation wholly owned by the Tokai Corporation of Japan which performs the physical manufacture and assembly of the Aim N Flame.

(See Pls.' Mem. Br. in Opp'n to Mot. for Summ. J. of Scripto–Tokai Corporation, Statement of Additional Disputed Facts ¶ B(1)(a)—(c) [filed July 2, 1999]; *admitted at* Reply Br. in Supp. of Mot. for Summ. J. of Def. Scripto–Tokai Corporation, Resp. Concerning Disputed Facts ¶ B(1)(a)—(c) [filed July 23, 1999].)

held self-igniting, flame producing product that operates on fuel and is used by consumers to ignite items such as candles, fuel for appliances, charcoal, or gas-fired grills, campfires, camp stoves, lanterns fuel-fired appliances or devices or pilot lights." *See* 63 Fed.Reg. 52394 (1998) (proposing definition to be codified at 16 C.F.R. § 1145 for regulating utility lighters under the Consumer Product Safety Act). In 1985, Scripto began marketing the Aim N Flame in the United States. (Scheduling Order, Undisputed Facts ¶ 10.) The Aim N Flame design at issue in this case contains an "on/off" switch, also known as a "safety" switch, and, according to the Aim N Flame's packaging instructions, in order to light the Aim N Flame, the user must slide the safety switch to "on" and then press the ignition trigger. (Mem. Br. in Supp. of Mot. for Summ. J. of Scripto–Tokai Corporation, Ex. 15 [Blister Cards for the Aim N Flame from 1992 through 1994] [filed Apr. 21, 1999] [hereinafter "Def. Scripto's Br."].) The Aim N Flame also contained warnings on its packaging and on the lighter itself which instruct the user to keep and store the Aim N Flame out of reach of children. (*Id.*, Ex. 15 [Blister Cards for the Aim N Flame from 1992 through 1994].)

In April 1996, Stacy Bartholic and her two children, then three-year-old Tony and nineteen-month-old Jerred, were living with Shirley, Gerald, and Janna Apodaca (Bartholic's mother, stepfather, and stepsister, respectively) in a townhouse rented from Defendants Richard and Lana Grimm in Aurora, Colorado.[2] (*Id.*, Statement of Undisputed Facts ¶¶ 1–3; *admitted at* Pls.' Mem. Br. in Opp'n to Mot. for Summ. J. of Scripto–Tokai Corporation, Resp. to Statement of Undisputed Facts ¶¶ 1–3 [filed July 2, 1999] [hereinafter "Pls.' Resp."].) At the time Bartholic moved into the Grimm's townhouse, there was a Scripto Aim N Flame utility lighter stored on top of a water heater located in a utility closet inside the townhouse. (*Id.*, Statement of Undisputed Facts ¶ 5; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 5.)

On the morning of April 4, 1996, as she was getting ready for work, Shirley Apodaca heard Jerred stirring in his crib and informed Bartholic that his diaper needed to be changed. (*Id.*, Statement of Undisputed Facts ¶¶ 10–11; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶¶ 10–11.) Bartholic got up, changed Jerred's diaper, and then returned to the bedroom where she and Tony slept. (*Id.*, Statement of Undisputed Facts ¶ 12; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 12.) At the time Bartholic returned to the bedroom, Tony was asleep; however, after Bartholic fell back asleep, Tony woke up and left the bedroom without waking Bar-

---

2. As an initial matter, I note that plaintiffs' response brief contains a thirty-page statement of "additional disputed facts" which, for the most part, utterly fails to comply with sections III(5) and III(7) of this court's Hearing, Conference, and Trial Procedures. Although this court appreciates plaintiffs' desire to develop a full record, this zeal does not excuse plaintiffs from complying with this court's directives that: (1) legal argument is not permitted in the facts portion of a summary-judgment brief; and (2) additional disputed facts shall be set forth in simple, declarative **sentences, separately numbered and paragraphed** and accompanied by a specific reference to material in the record. (*See* Hr'g, Conference and Trial Procedures, § III[5], [7].) Accordingly, I disregard those portions of plaintiffs' "Statement of Additional Disputed Facts" that fail to comply with these directives. Furthermore, in the interests of economy, I will not recite plaintiffs' additional disputed facts here. Instead, I will address only those additional disputed facts that are relevant to the legal issues raised by Scripto's summary-judgment motion at the appropriate place in my discussion of the merits of Scripto's motion.

tholic. (*Id.*, Statement of Undisputed Facts ¶¶ 12, 14; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶¶ 12, 14.) After leaving the bedroom, Tony somehow retrieved the Aim N Flame from atop the water heater in the utility closet and began playing with it in Jerred's bedroom near his crib. (Pls.' Resp., Statement of Additional Disputed Facts ¶ A(7); *admitted in pertinent part at* Reply Br. Supp. of Mot. for Summ. J. of Def. Scripto-Tokai Corporation, Resp. Concerning Disputed Facts ¶ A(7) [filed July 23, 1999] [hereinafter "Def. Scripto's Reply"].) As a result of his child-play with the Aim N Flame, Tony started a fire that severely injured Jerred, leaving him with second- and third-degree burns over eighty percent of his body. (*Id.*, Statement of Additional Disputed Facts ¶ A(7); *admitted in pertinent part at* Def. Scripto's Reply, Resp. Concerning Disputed Facts ¶ A(7), Def. Scripto's Br., Statement of Undisputed Facts ¶ 19.)

On March 31, 1998, plaintiffs filed their amended complaint in this court, asserting claims against Scripto for: (1) strict products liability based on the design of the Aim N Flame and Scripto's inadequate warning regarding its danger; (2) negligence in the design and labeling of the Aim N Flame; and (3) failure to comply with Consumer Product Safety Commission safety standards and reporting requirements, in violation of the Consumer Product Safety Act. (Am. Comp. ¶¶ 42–66 [filed Mar. 31, 1998] [hereinafter "Am. Compl."].) As part of their requested relief, plaintiffs seek to recover punitive damages from Scripto, pursuant to Colo. Rev.Stat. § 13–21–102 (1999). (*Id.*) Plaintiffs also assert a negligence claim against Richard and Lana Grimm for failure to install smoke detectors in the townhouse. (*Id.* ¶¶ 67–74.) On April 21, 1999, Scripto moved for summary judgment on all of plaintiffs' claims against it. (Mot. for Summ. J. of Scripto–Tokai Corporation [filed Apr. 21, 1999].) Scripto argues that it is entitled to summary judgment because: (1) there is no evidence that the Aim N Flame was defective or that any alleged defect caused plaintiffs' injuries; (2) there is no evidence that Scripto's warnings regarding the dangers of the Aim N Flame were inadequate or that any additional warnings would have prevented the fire; (3) the Aim N Flame is not subject to the regulations promulgated by the Consumer Products Safety Commission; and (4) there is no evidence to support plaintiffs' claim that Scripto's conduct rose to requisite level of culpability to sustain an award of punitive damages under Colo.Rev.Stat. § 13–21–102. (Def. Scripto's Br. at 5–20.)

## ANALYSIS

### 1. Legal Standard

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the

allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed.R.Civ.P. 56(e). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir.1990]).

## 2. Strict Products Liability

■ Because this is a diversity case and the injury happened in Colorado, Colorado law governs plaintiffs' state-law tort claims, *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In determining the extent of a manufacturer's liability for a defective product, Colorado adheres to the doctrine of strict products liability as set forth in section 402A of the Restatement (Second) of Torts. *Camacho v. Honda Motor Co.*, 741 P.2d 1240, 1244 (Colo.1987) (citations omitted); *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983, 987 (1975) ("We hereby expressly adopt the doctrine of strict liability in tort which is stated in § 402A [of the Restatement (Second) of Torts]."). Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965) [hereinafter "Section 402A"].

■ "Strict liability, however, is not the equivalent of absolute liability, and the fact that an accident may occur in connection with the use of a product does not necessarily mean that the manufacturer is liable." *McHargue v. Stokes Div. of Pennwalt*, 686 F.Supp. 1428, 1434, (D.Colo.1988) (citing *Kysor Indus. Corp. v. Frazier*, 642 P.2d 908, 911 [Colo. 1982]). Rather, to recover on a theory of strict products liability, a plaintiff must establish that: (1) the product is in a defective condition unreasonably dangerous to the user or consumer; (2) the product is expected to and does reach the consumer without substantial change in the condition in which it was sold; (3) the defect caused the plaintiff's injuries; (4) the defendant sold the product and is engaged in the business of selling products; and (5) the plaintiff sustained damages. *Barton v. Adams Rental, Inc.*, 938 P.2d 532, 536–37 (Colo.1997) (citing *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276, 282–83 [1978].) Scripto concedes the second, fourth, and fifth elements of plaintiffs' strict products liability claim and challenges only plaintiffs' assertions with respect to the first and third elements. Specifically, Scripto contends that there is *no evidence* that: (1) *the Aim N Flame had a defect that rendered it unreasonably dangerous*; or (2) *any alleged defect in the Aim N Flame caused plaintiffs' injuries*. (Def. Scripto's Br. at 4–10; Def. Scripto's Reply at 14–18.)

"A product may be unreasonably dangerous due to a manufacturing defect, design defect, or a failure to warn." *Camacho*, 741 P.2d at 1247 (citations omitted); *accord White v. Caterpillar, Inc.*, 867 P.2d 100, 105 (Colo.Ct.App.1993) (citations omitted). While some courts have eliminated the "unreasonably dangerous" requirement, Colorado has declined to so because this requirement "serves the useful function of placing some limits on the liability of a manufacturer or seller." *Pust*, 583 P.2d at 282 n. 5. Thus, to prevail on a claim under Colorado law, the plaintiff must prove that the product was both "defective" and "unreasonably dangerous." [3] *McHargue*, 686 F.Supp. at 1434. The question of whether a product is defective and unreasonably dangerous is generally an issue for the jury. *Kysor Indus. Corp. v. Frazier*, 642 P.2d 908, 913 (Colo. 1982); *McHargue*, 686 F.Supp. at 1434 (citations omitted). Here, plaintiffs allege that the Aim N Flame was defective and unreasonably dangerous due to (1) a design defect, and (2) Scripto's failure to provide an adequate warning. (Pls.' Resp. at 45–47, 50–54.) I address each of these alleged defects separately.

### a. Design–Defect Claim

#### i. Does the Aim N Flame's Design Render It Defective and Unreasonably Dangerous?

Plaintiffs claim that the design of the Aim N Flame was defective because it failed to incorporate adequate child-resistant safety devices. (*Id.* at 3, 42, 46.) Plaintiffs maintain that several child-resistant designs were technologically and economically feasible at the time of the accident. (*Id.* at 46.) As an initial matter,

Scripto argues that the failure to include a child-resistant device on the Aim N Flame does not constitute a defect, and, thus, this court need not reach the issue of whether the Aim N Flame was defective and unreasonably dangerous. (Def. Scripto's Reply at 13–14.) Specifically, Scripto contends that, because the Aim N Flame provides some level of child-resistance—namely the "on/off" or "safety" switch—plaintiffs cannot demonstrate a defect. (*Id.*) I find this argument unpersuasive for two reasons. First, it is well established that a failure to provide safety devices can form the basis for a design-defect claim under Section 402A. *McHargue*, 686 F.Supp. at 1434 (citing *Pust*, 583 P.2d at 280 and cases cited therein). Second, as used in design-defect cases, the term defect "does not mean a mere mechanical or functional defect but is anything that makes the product 'unreasonably dangerous.'" *Armentrout v. FMC Corp.*, 842 P.2d 175, 186 (Colo.1992) (quoting *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 643 [Colo. 1988].) As discussed in greater detail below, plaintiffs submit evidence that supports their theory that the Aim N Flame as currently designed is unreasonably dangerous. Accordingly, I conclude that plaintiffs have sufficiently alleged a defect, and I now focus on the larger issue of whether the Aim N Flame was unreasonably dangerous.

Colorado courts recognize two tests for determining when a design defect renders a product unreasonably dangerous: (1) the consumer expectation test; and (2) the risk-benefit test. *Ortho Pharm. Corp. v. Heath*, 722 P.2d 410, 412–14 (Colo.1986) (adopting risk-benefit test) *overruled in part by Armentrout*, 842 P.2d

---

**3.** Although "defective" and "unreasonably dangerous" appear to be two distinct elements, in design-defect cases the term "defective" generally serves as an abbreviation for the term "defective and unreasonably danger-ous" as used in Section 402A. *See Armentrout v. FMC Corp.*, 842 P.2d 175, 186 (Colo.1992) (distinguishing between the different uses of the term "defective" in a design-defects).

at 183 (overruling *Ortho Pharmaceutical* to the extent that it purported to place the burden of proof under the risk-benefit test on the manufacturer to prove that "the product's benefits outweigh its inherent risks"); *White*, 867 P.2d at 105. The consumer expectation test relies largely on comment i of Section 402A which, in relevant part, provides: "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *White*, 867 P.2d at 105 (quoting Section 402A cmt. i). Thus, under the consumer expectation test, "a product is unreasonably dangerous because of a defect in its design if it creates a risk of harm to persons or property which would not ordinarily be expected." *Id.* In contrast to the consumer expectation test, the risk-benefit test employs a risk-benefit analysis to determine whether a product is unreasonably dangerous. *Id.* Thus, under the risk-benefit test, a product becomes unreasonably dangerous when the magnitude "of danger inherent in a challenged design outweighs the benefit of such a design." *Barton*, 938 P.2d at 537 (citing *Armentrout*, 842 P.2d at 183). The risk-benefit test is required "where the unreasonableness of the danger in the design defect and the efficacy of alternative designs in achieving a reasonable degree of safety must be defined by primarily technical, scientific information." *Camacho*, 741 P.2d at 1246–47.

The parties hotly contest which test should be applied to the Aim N Flame's alleged design defect—Scripto's failure to provide adequate child-resistance features—in order to determine if the Aim N Flame is unreasonably dangerous. According to plaintiffs, Colorado has abandoned the consumer expectation test in favor of the risk-benefit test, and under the risk-benefit test, there exist disputed issues of material fact which preclude summary judgment, given the foreseeability of child-play fires and the feasibility of alternate, child-safe designs that would not impair the Aim N Flame's utility. (Pls.' Resp. at 39–46.) Scripto, on the other hand, vigorously maintains that the dangerousness of the Aim N Flame must be judged solely under the consumer expectation test because the risk-benefit test only applies in cases involving complex products such as automobiles, motorcycles, and drugs. (Def. Scripto's Reply at 15–16.) According to Scripto, it is entitled to summary judgment under the consumer expectation test because courts around the country that have considered the issue uniformly hold that the lack of a child-resistant device on a lighter does not render the product defective and unreasonably dangerous. (*Id.* at 16.)

The issue raised by the parties appears to be one of first impression in Colorado. Thus, "[a]s a federal court sitting in diversity, '[ ][my] task ... is to ascertain and apply Colorado law to the end that the result obtained in federal court is the result that would have been reached if this litigation had been pursued in a Colorado court.'" *Perlmutter v. United States Gypsum Co.*, 54 F.3d 659, 662 (10th Cir.1995) (citations omitted). I must regard pronouncements of the Colorado Supreme Court as authoritative statements of Colorado law. *Romero v. International Harvester Co.*, 979 F.2d 1444, 1449 n. 3 (10th Cir.1992). Where areas of state law are not developed, a federal court may resort to other persuasive authorities to determine how the Colorado Supreme Court would decide the issue. *Heller Intern. Corp. v. Sharp*, 974 F.2d 850, 858 (7th Cir.1992).[4]

4. On this note, each side presents ample authority from other jurisdictions in support of its respective position. *Compare Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir.

■ After much consideration and a thorough review of the precedents in this jurisdiction, I find that I cannot accept Scripto's contention that Colorado has adopted the risk-benefit test only with respect to cases involving complex products. Scripto reads too much into the language of cases like *Ortho Pharmaceutical* and *Camacho* that hold that the risk-benefit is required where the dangerousness of the product "is defined primarily by technical, scientific information." *Ortho Pharm. Corp.*, 722 P.2d at 414; *Camacho*, 741 P.2d at 1247. Although I agree with Scripto that Colorado law requires the application of the risk-benefit test to complex products, I find nothing in these cases that suggests that the risk-benefit test is limited to such products. To the contrary, a reading of *Camacho* and subsequent cases reveals that Colorado holds the consumer expectation test in disfavor. *Camacho*, 741 P.2d at 1245 ("The obvious and foreseeable consumer contemplation test employed by the trial court and approved by the Court of Appeals is substantially similar to the open and obvious standard specifically rejected in *Pust*. It is not an appropriate standard in Colorado for measuring whether a particular product is in defective condition unreasonably dangerous to the consumer or user."); *accord Barton*, 938 P.2d at 537 ("To determine whether a product is 'unreasonably dangerous' ... we have adopted a straightforward risk-benefit analysis.");

*McHargue*, 686 F.Supp. at 1440 ("In Colorado, the standard for determining whether the design of a product is defective and unreasonably dangerous is not whether the product is more dangerous than the ordinary user or consumer would expect, but rather whether the magnitude of the danger outweighs the utility of the design.").

Likewise, basic tort policy considerations, as expressed by the Colorado courts, militate in favor of analyzing the dangerousness of the Aim N Flame under the risk-benefit test. For example, in *Camacho*, after thoroughly analyzing the policy underlying strict products liability, the Colorado Supreme Court opined:

These considerations strongly suggest that the consumer contemplation concept embodied in comment i [to Section 402A], while illustrative of a particular problem, does not provide a satisfactory test for determining whether particular products are in a defective condition unreasonably dangerous to the user or consumer. In the final analysis, the principle of products liability contemplated by section 402A is premised upon the concept of enterprise liability for casting defective products into the stream of commerce. The primary focus must remain upon the nature of the product under all relevant circumstances rather than upon the conduct of either the consumer or the manufacturer. Total reli-

---

1994) (en banc) (holding 6–5 that an Illinois court would not apply the risk-benefit test to disposable lighter because it is "a simple but obviously dangerous product"); *Kirk v. Hanes Corp.*, 16 F.3d 705, 711 (6th Cir.1994) (holding 2–1 under Michigan law that the risk-benefit test does not apply to "simple tools" such as a disposable lighter); *with Hernandez v. Tokai Corp.*, 2 S.W.3d 251 (Tex.1999) (holding in response to certified question from the Fifth Circuit Court of Appeals that under Texas law risk-benefit test applies to disposable lighters); *Perkins v. Wilkinson Sword, Inc.*, 83

Ohio St.3d 507, 700 N.E.2d 1247, 1252 (1998) (holding that risk-benefit test applies to disposable lighters); *Price v. BIC Corp.*, 142 N.H. 386, 702 A.2d 330, 332–333 (1997) (holding that risk-benefit test applies to design-defect claims against manufacturer of disposable lighter); *Ray v. BIC Corp.*, 925 S.W.2d 527, 532 (Tenn.1996) (holding in response to certified question from Sixth Circuit Court of Appeals that Tennessee law authorizes use of risk-benefit test to determine if disposable lighter is unreasonably dangerous).

ance upon the hypothetical ordinary consumer's contemplation of an obvious danger diverts the appropriate focus and may thereby result in a finding that a product is not defective even though the product may easily have been designed to be much safer at little added expense and no impairment of utility. Uncritical rejection of design defect claims in all cases wherein the danger may be open and obvious thus contravenes sound public policy by encouraging design strategies which perpetuate the manufacture of dangerous products.

*Camacho,* 741 P.2d at 1246 (internal citations omitted). In the same the vein, the *Camacho* court noted that "[b]y examining and weighing the various interests represented by these [risk-benefit] factors, a trial court is much more likely to be fair to the interests of both manufacturers and consumers in determining the status of particular products." *Id.* at 1248. Additionally, Scripto has not cited, nor has my research revealed, a reported Colorado case subsequent to *Camacho* where a court has analyzed the dangerousness of a product, complex or otherwise, solely under the consumer expectation test. Thus, although the consumer expectation remains a valid measure of a product's dangerousness to a certain extent, Colorado courts are unwilling to apply it as the sole measure for determining whether a design defect renders a product unreasonably dangerous. *See, e.g., Biosera, Inc. v. Forma Scientific, Inc.,* 941 P.2d 284, 287 (Colo.Ct.App.1996) (holding that consumer expectation test and risk-benefit test are not mutually exclusive and that trial court did not err in instructing jury on both tests where the plaintiff produced evidence

that an ultra-cold freezer was defective because it could be turned off inadvertently by pressure on the power switch as slight as a broom brushing up against it); *White,* 867 P.2d at 105 (reversing trial court because it failed to instruct the jury on the risk-benefit test); *Hilberg v. F.W. Woolworth Co.,* 761 P.2d 236, 240–41 (Colo. Ct.App.1988) (applying both tests and holding that rifle was not unreasonably dangerous under either test). In sum, I conclude that, if confronted with this issue, the Colorado Supreme Court would hold the risk-benefit test is applicable to a product like the Aim N Flame, especially where, as here, the alleged design defect centers on the existence of a feasible alternate design.[5]

 I now turn to the question of whether the Aim N Flame is unreasonably dangerous under either the risk-benefit test or consumer expectations test. Under the risk-benefit test, Colorado courts consider the following factors in balancing the attendant risks and benefits of a product to determine whether a product design is unreasonably dangerous:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury and the probable seriousness of the injury.

(3) The availability of the substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or mak-

---

5. To the extent that Colorado law is undeveloped in this area, I find that the cases from other jurisdictions that have applied the risk-benefit test to disposable lighters more representative of Colorado's general position on determining when a product is defective and unreasonably dangerous and believe that a Colorado court would adopt the reasoning of these cases as persuasive.

ing it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Ortho Pharm.*, 722 P.2d at 414 (relying on *John W. Wade, On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 837–38 [1973] ). These factors are not exhaustive "but merely illustrative of factors which may assist in determining whether or not a design is unreasonably dangerous." *Armentrout*, 842 P.2d at 184. "Depending on the circumstances of each case, flexibility is necessary to decide which factors are to be applied and the list of factors ... may be expanded or contracted as needed." *Id.* "The proponents of a design-defect claim bear the burden of demonstrating that, on balance, the risk of danger inherent in a challenged design outweighs the benefits of such a design." *Barton*, 938 P.2d at 537 (citations omitted).

■ Here, plaintiffs concede that the Aim N Flame is useful, but contend that a factual issue still exists as to whether the Aim N Flame is nevertheless defective and unreasonably dangerous due to Scripto's failure to provide adequate child-resistance. I agree. As stated earlier, the question of whether a product is unreasonably dangerous is generally a question for the jury. *Pust*, 583 P.2d at 279. Plaintiffs present evidence on several of the factors

set forth in *Ortho* which could support a jury's finding that the Aim N Flame was unreasonably dangerous. Specifically, plaintiffs offer expert witness testimony and Consumer Product Safety Commission data to the effect that the risk of child-play fires was well-known to Scripto and that the Aim N Flame as designed did not provide a sufficient level of child-resistance. For example, Consumer Product Safety Commission data reveals that from 1988 through 1995, children under the age of five started forty-four fires with utility lighters like the Aim N Flame, which resulted in ten deaths and seventeen injuries.[6] (Pls.' Supplementation of Evidence in Opp'n to Def's Mot. for Summ.J. at 36 [filed Dec. 8, 1999] [hereinafter Pls.' Supplementation of Evidence].) Likewise, Scripto's own reports to the Consumer Product Safety Commission establish that Scripto was aware that young children were starting fires with the Aim N Flame. (Evidentiary Supp. for Pls.' Resp. to Mot. for Summ.J. of Def. Scripto–Tokai, Ex. 138A [Letter and Accompanying Exhibits from Scripto to the Consumer Product Safety Commission (3/15/96) ] [filed June 15, 1999] [hereinafter "Pls.' Evidentiary Supp."].) Also, plaintiffs' experts opine that the Aim N Flame was not sufficiently child-resistant in light of the known risks that children play with lighters because: (1) children as young as two could manipulate the "safety" switch on the Aim N Flame; and (2) the amount of trigger pull required to operate the Aim N Flame was so low that young children could easily ignite the Aim N Flame. (*Id.*, Ex. 503 [Kvalseth Aff. at 8–10], Ex. 514 [Pollack–Nelson Aff. at 15–16].)

Additionally, and perhaps most importantly, plaintiffs have offered expert tes-

---

**6.** In 1996, the year of the Bartholic fire, these numbers jumped to fifty-seven, eight, and thirty-two respectively. (*Id.*)

timony describing a number of safety features that were technologically and economically feasible at the time of the April 4, 1996, fire and which would have prevented the accident.[7] For instance, Tarold Kvalseth states that Scripto could have: (1) adapted its existing child-safety feature designs used in its child-resistant disposable cigarette lighters to the Aim N Flame; (2) designed a utility lighter that requires both hands to operate; or (3) added a locking mechanism that must be depressed at the same time as the trigger. (*Id.,* Ex. 503 [Kvalseth Aff. at 3–4].) According to Kvalseth, all of these designs were technologically feasible as early as 1985, when the Aim N Flame first entered the market. (*Id.*) The record further reveals that Scripto had applied for patents on various child-resistant designs for the Aim N Flame as early as 1994. (*Id.,* Ex. 181 [Patent No. 5,697,775 (filed Aug. 1995, with United States Patent and Trademark Office and listing foreign patent application dates)].) Finally, there is evidence in the record that suggests a child-resistant design would have only increased the manufacturing cost of the Aim N Flame by three yen (roughly three cents) per unit. (*Id.,* Ex. 291 [Internal Scripto Memorandum (5/20/96)].)

In contrast to the mass of evidence presented by plaintiffs, Scripto's submissions to this court contain no evidence or legal argument specifically addressed to plaintiffs' contention that the Aim N Flame is unreasonably dangerous under the risk-benefit test. Instead, Scripto has chosen to argue that plaintiffs cannot maintain a design-defect claim because the law does not impose a duty upon manufactures to make products intended for adults child-

proof. (Def. Scripto's Br. at 9.) Scripto recently made this same argument to the Texas Supreme Court and the court rejected it. *See Hernandez,* 2 S.W.3d at 261. In rejecting Scripto's argument the court stated:

> As we have explained, a product that is safely designed for its intended users is not unreasonable dangerous solely because someone else may obtain the product. But we think that the issue should be resolved by applying the standard risk-utility analysis rather than as a matter of legal policy....

*Id.* Although *Hernandez* is not binding on this court, I believe that it is in accordance with the strict liability policies of Colorado, and, therefore, I choose to apply its reasoning to the case at bar. Consequently, because Scripto fails to address why it has no duty to child-proof the Aim N Flame under the risk-benefit test, I conclude that it is not entitled to summary judgment on this argument.

■ Scripto next contends that, even if the incorporation of a child-resistant design into the Aim N Flame would have made the Aim N Flame safer, it is still entitled to summary judgment because a manufacturer is not required to make a completely safe product. (Def. Scripto's Br. at 9.) According to Scripto, the issue here is not whether the alternative design (a child-resistant lighter) would have made the product safer but whether the design of the actual product is defective and unreasonably dangerous. (*Id.*) While I agree in principle with Scripto, this argument only goes so far in the instant case. As Judge Arraj, former chief judge of this court, astutely noted in *McHargue,* 686 F.Supp. at 1441, "[w]hile true [that a man-

---

7. In the realm of products liability, "feasible" has been defined as "a finding that the proposed change is technologically possible and that any additional cost is outweighed by the magnitude of the danger that could be avoided." *McHargue,* 686 F.Supp. at 1441 (citing *W. Prosser & W. Keeton, Prosser & Keeton on Torts* § 99 at 700 [5th ed.1984]).

ufacturer need not design a completely safe product], this does not mean that a finding of defectiveness cannot be based in part upon evidence that other feasible designs were available and common in the industry." Here, plaintiffs have presented sufficient evidence, based in large part on the existence of feasible alternate designs, to support a finding by the trier of fact that the Aim N Flame as designed was indeed defective. Consequently, Scripto's summary-judgment motion is denied with respect to its contention that the Aim N Flame was not defective and unreasonably dangerous. Moreover, because plaintiffs' design-defect claim survives summary judgment under the risk-benefit test, I need not address whether the Aim N Flame is defective and unreasonably dangerous under the consumer expectation test.

### ii. Causation

Lastly, Scripto argues that it is entitled to summary judgment on plaintiffs' design-defect claim because there is no evidence that the absence of a child-resistant design caused this particular accident. (Def. Scripto's Br. at 8–9.) The thrust of Scripto's argument is that, because a child-resistant lighter is not child-proof, plaintiffs cannot establish that the lack of safety features on the Aim N Flame caused Jerred's injury. (*Id.* at 9.) I disagree.

The issue of causation is normally one for a jury. *Eggert v. Mosler Safe Co.,* 730 P.2d 895, 898 (Colo.Ct.App. 1986). Circumstantial evidence is an acknowledged basis for showing causation. *Branco Eastern Co. v. Leffler,* 173 Colo. 428, 482 P.2d 364, 366 (1971). Therefore, only in instances where the facts allow reasonable minds to draw but one inference should causation be decided by the court as a matter of law. *Eggert,* 730 P.2d at 898. This is not one of the those instances, at least with respect to plaintiffs' de-

sign-defect claim. To the contrary, it is undisputed, for the purposes of this motion, that the source of the fire was Tony's child-play with the Aim N Flame. In addition, plaintiffs offer testimony from several expert witnesses that a child-resistant lighter would have prevented or, at the very least, greatly reduced the risk of Tony starting a fire. (Pls.' Evidentiary Supp.Ex. 503 [Kvalseth Aff. at 10], Ex. 508 [Drago Aff. at 9], Ex. 533 [Geremia Aff. at 27].) Moreover, Dorthy Drago, plaintiffs's child-safety expert, testified that the entire purpose of a child-resistant design is to frustrate children so that they lose interest in playing with the product in question. (*Id.,* Ex. 508 [Drago Aff. at 9], Drago Dep. at 123.)

Thus, when viewing the evidence in a light most favorable to plaintiffs, a reasonable juror could infer that there was a sufficient nexus between plaintiffs' allegations of inadequate design and the fire which injured Jerred to support the conclusion that the design defect in the Aim N Flame was the cause of Jerred's injuries. Therefore, Scripto's summary-judgment motion is denied with respect to plaintiffs' strict liability design-defect claim.

### b. Failure to Warn

Plaintiffs also assert that the failure to provide adequate warnings rendered the Aim N Flame defective and unreasonably dangerous. (Pls.' Resp. at 50–55.) Plaintiffs further contend that additional warnings such as: (1) THIS LIGHTER IS NOT CHILD RESISTANT; and (2) SMALL CHILDREN ARE ATTRACTED TO THIS LIGHTER AND CAN EASILY OPERATE IT should have been included with the Aim N Flame. (*Id.*) Scripto, on the other hand, maintains that it is entitled to summary judgment because there is no evidence that: (1) the warnings it provided were inadequate; and (2) any additional

warnings would have prevented this accident. (Def. Scripto's Br. at 10–12; Def. Scripto's Reply at 18–22.)

 Under Colorado law, "a failure adequately to warn can render a product, otherwise free of defects, defective for the purposes of strict liability recovery."[8] *Staley v. Bridgestone/Firestone, Inc.,* 106 F.3d 1504, 1509 (10th Cir.1997) (citations omitted). "The purpose of a warning is to ensure that an otherwise dangerous product is used in a reasonably safe manner." *Camacho,* 741 P.2d at 1248. "In determining whether, as a matter of law, a defect exists because of a manufacturer's failure to warn, courts must consider the necessity or adequacy of warnings in light of all the evidence." *Davis v. Caterpillar Tractor Co.,* 719 P.2d 324, 328 (Colo.Ct.App. 1985) (citing *Kysor Indus. Corp.,* 642 P.2d at 913) In assessing the adequacy of a warning, the Colorado Supreme Court has opined:

> The warning should be such that if followed would make the product safe for users. To comply with this duty the manufacturer or supplier must appropriately label the product, giving due consideration to the likelihood of accident and the seriousness of consequences from failure to so label it as to warn of any dangers that are inherent in it and its use or that may arise from the improper handling or use of the product.

*Hiigel,* 544 P.2d at 988. Thus, a warning is sufficient when it adequately informs the ordinary user of any specific risk of harm which may be involved in any intended or reasonably expected use. *Armentrout,* 842 P.2d at 180. Where the danger of a product "is open and obvious, there is no duty to warn unless there is a substantial likelihood that the proposed warnings would have prevented injury to the ordinary user." *Id.* at 181. If a manufacturer fails to comply with the duty to warn, the product may be considered defective when the breach of this duty is the proximate cause of the plaintiff's injuries. *Hiigel,* 544 P.2d at 988.

 Here, it is undisputed that Scripto provided warnings both on the Aim N Flame's packaging and the Aim N Flame itself. The Aim N Flame packaging contained several prominent warnings stating: (1) KEEP AWAY FROM CHILDREN; and (2) KEEP AND STORE OUT OF REACH OF CHILDREN. Also, directly affixed to the Aim N Flame was the warning: KEEP AND STORE AWAY FROM CHILDREN. The gravamen of plaintiffs' failure-to-warn claim, however, is that these warnings were inadequate because they failed adequately to alert consumers to the dangers inherent to the Aim N Flame.[9] (*Id.* at 3.) I disagree. I find that these clear and unambiguous warnings adequately informed adults of the specific risks associated with children and the Aim N Flame. Indeed, Bartholic conceded as much in her deposition when she admitted that the she does not need a warning to tell her that a butane lighter is dangerous in the hands of a child. (Def. Scripto's Br., Ex. 1 [Bartholic Dep. at 152].) Likewise, Gerald Apodaca admits that he does not need a warning to tell him that a lighter is dangerous in the hands of a child. (*Id.,* Ex. 2 [G. Apodaca Dep. at 76].) Further-

---

8. In the context of a failure-to-warn claim, the concepts of defect and unreasonable dangerousness have merged. *See Fibreboard Corp. v. Fenton,* 845 P.2d 1168, 1173 n. 10 (Colo. 1993). Thus, in a failure-to-warn case, it is the lack or the insufficiency of the warning that makes a product both defective and unreasonably dangerous. *Id.*

9. Specifically, plaintiffs argue that these warnings were inadequate because: (1) they were ambiguous because plaintiffs complied with them—by storing the Aim N Flame atop the water heater—and yet the accident still occurred; and (2) the labeling of the "on/off" switch as a "safety" switch provided a false sense of security. (*Id.* at 54–55.)

more, despite plaintiffs' protestations to the contrary, Bartholic's testimony that her cigarette lighters were child-proof and Apodaca's belief that the Aim N Flame was no more dangerous than a cigarette lighter—which I note that except for the purposes of their failure-to-warn claim plaintiffs maintain is a very dangerous product—does not detract from the fact that they were both aware of the inherent dangers associated with a child playing with a lighter.

Plaintiffs also contend that the Aim N Flame needed additional warnings to inform consumers that: (1) the lighter was not child resistant; and (2) small children can easily operate it. (Pls.' Resp. at 54–55.) This portion of plaintiffs' failure-to-warn claim fails because plaintiffs have not offered any evidence that would suggest a substantial likelihood that these proffered warnings would have prevented this accident. *See Armentrout,* 842 P.2d at 181. Indeed, plaintiffs do not provide a single evidentiary cite to support their claim that additional warnings would have rendered the Aim N Flame safe. To the contrary, plaintiffs' team of experts all concede that additional warnings (or warnings in general for that matter) are insufficient to prevent child-play fires. (Def. Scripto's Br., Ex 7 [Geremia Dep. at 86], Ex. 13 [Kvalseth Dep. at 54], Ex. 18 [Kites Dep. at 89], Ex. 24 [Pollack–Nelson Aff. at 14].) Indeed, the thrust of plaintiffs' case and the evidence produced to support it is that warnings are ineffective to stop child-play fires and Scripto should have designed a child-resistant Aim N Flame rather than relying on warnings. To that end, plaintiffs' failure-to-warn claim is fundamentally a design-defect claim. *See Staley,* 106 F.3d at 1509.

In sum, I conclude that the warnings provided by Scripto were adequate to advise plaintiffs of the specific and obvious risks associated with the Aim N Flame such that Aim N Flame was not defective and unreasonably dangerous. Scripto, therefore, is entitled summary judgment on plaintiffs' failure-to-warn claim. Because I find the adequacy of Scripto's warnings dispositive of this claim, I need not address Scripto's causation argument.

### 3. Negligence

To establish a prima *facie case* for negligence, regardless of the specific negligence theory, Colorado law requires a plaintiff to establish: (1) the existence of a legal duty owed by the defendant to the plaintiff; (2) breach of that duty; and (3) a sufficient causal relationship between the defendant's breach and the plaintiff's injuries. *Martinez v. Lewis,* 969 P.2d 213, 217 (Colo.1998); *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 929 (Colo.1997); *Connes v. Molalla Transp. Sys., Inc.,* 831 P.2d 1316, 1320 (Colo.1992); *Ayala v. United States,* 846 F.Supp. 1431, 1437 (D.Colo.1993). Plaintiffs contend that Scripto was negligent in: (1) not designing a more child-resistant Aim N Flame; and (2) failing to provide adequate warnings to consumers concerning the inherent dangers associated with the Aim N Flame. (Pls.' Resp. at 3.) Scripto maintains that it is entitled to summary judgment on plaintiffs' negligence claims because: (1) the law does not impose a duty on manufactures to make adult products such as the Aim N Flame child-resistant; and (2) its warning regarding the dangers of the Aim N Flame were adequate as a matter of law. (Def. Scripto's Br. at 9, 11–12.) I address each of Scripto's arguments separately.

#### a. Duty to Design a Child–Resistant Lighter

A negligence claim will fail if it is predicated on circumstances for which the law imposes no duty of care upon the

defendant. *Connes,* 831 P.2d at 1320 (further citations omitted). "A court's conclusion that a duty does or does not exist is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection.'" *University of Denver v. Whitlock,* 744 P.2d 54, 57 (quoting *W. Keeton et al., Prosser & Keeton on the Law of Torts* § 53, at 358 [5th ed.1984] ). "The initial question in any negligence action, therefore, is whether the defendant owed a legal duty to protect the plaintiff against injury." *Connes,* 831 P.2d at 1320. The existence and scope of a legal duty is a question of law for the court to decide. *Imperial Distrib. Servs. v. Forrest,* 741 P.2d 1251, 1254 (Colo.1987).

 It is a well-established principle of Colorado jurisprudence that, "where a person should reasonably foresee that his act, or failure to act, will involve an unreasonable risk of harm to another, there is a duty to avoid such harm." *Largo Corp. v. Crespin,* 727 P.2d 1098, 1102 (Colo.1986) (citations omitted). Thus, while foreseeability is a "prime factor in the duty calculus," Colorado courts also weigh other factors, including "the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm caused to the plaintiff, the practical consequences of placing such a burden on the defendant, and any additional elements disclosed by the particular circumstances of the case." *Connes,* 831 P.2d at 1320. (citations omitted). "'No one factor is controlling, and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists.'" *Id.* (citing *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 [Colo. 1987] ). In general, a product manufacturer has a duty "to act reasonably in the design, manufacture, and sale of the product." *See Halliburton v. Public Serv. Co.,* 804 P.2d 213, 216–217 (Colo.Ct. App.1990).

 Applying these factors to the instant case, I conclude that Scripto's general duty to act reasonably in the design of its products extends to designing a child-resistant Aim N Flame. Indeed, the foreseeability of child-play fires under circumstances similar to those here is well documented not only by the evidence presented by plaintiffs in this case but also by numerous other lighter cases throughout the country. *See, e.g., Griggs v. BIC Corp.,* 981 F.2d 1429, 1435 (3d Cir.1992) (holding under Pennsylvania law that lighter manufacturer has a duty to child-proof cigarette lighter because, among other things, it is foreseeable that children will come into contact with lighters); *Bondie v. BIC Corp.,* 739 F.Supp. 346, 349 (E.D.Mich. 1990); *Scarpetta v. Health–Tex, Inc.,* No. 84–C–20352, 1990 WL 52986 *4–5 (N.D.Ill. Apr. 26, 1990) (finding that it is foreseeable that child may accidentally ignite the clothing of another child with a disposable lighter); *Campbell v. BIC Corp.,* 154 Misc.2d 976, 586 N.Y.S.2d 871, 873 (N.Y.Sup.1992); *Bean v. BIC Corp.,* 597 So.2d 1350, 1352–53 (Ala.1992). Furthermore, the social utility of Scripto's conduct—producing a utility lighter—does not outweigh the foreseeable risk that a child will suffer serious injury as the result of playing with an Aim N Flame. Similarly, the magnitude of the burden of guarding against possible injury and the practical consequences of placing such a burden on Scripto also militate in favor of imposing a duty on Scripto. As stated earlier, there is sufficient evidence in the record to establish that child-resistant designs for the Aim N Flame were both technologically and economically feasible at the time of Jerred's injury.

Based on the foregoing, I find that Scripto has a duty to provide child-resistant Aim N Flame lighter. Accordingly,

Scripto's motion for summary judgment with respect to plaintiffs' negligent-design claim is denied.

### b. Adequacy of Scripto's Warnings

 "A manufacturer or seller has a duty to warn of unreasonable dangers associated with the use of its products if the dangers are not obvious to its product users and if [ ] [the manufacturer or seller] knows or should know of them; breach of this duty constitutes negligence." *Staley,* 106 F.3d at 1509 (*quoting Davis,* 719 P.2d at 328); *Perlmutter,* 54 F.3d at 663 (citations omitted). Although there is a distinction between claims for negligence and strict liability based on a failure to warn, the same evidence will frequently be used to establish both claims. *Bond v. E.I. DuPont De Nemours & Co.,* 868 P.2d 1114, 1120 (Colo.Ct.App.1993) (citations omitted). Thus, "[t]he reasons which impose a duty to warn under [strict liability] also exist where the claim is based on negligence, and, generally, the law applicable to warnings under [strict liability] are instructive in negligence cases as well." *Perlmutter,* 54 F.3d at 663 (quoting *Halliburton,* 804 P.2d at 217). One important area of overlap is that, "[r]egardless of whether a product liability action is grounded in negligence or strict liability, a plaintiff must prove that the product was defective." *Id.* (quoting *Mile Hi Concrete, Inc. v. Matz,* 842 P.2d 198, 205 [Colo. 1992] ). Consequently, if a plaintiff fails to produce sufficient evidence that a product is defective, he cannot establish a *prima facie* case and the defendant is entitled to summary judgment. *Id.* (citations omitted).

Here, the same analysis which leads to the conclusion that the Aim N Flame was not defective with respect to its warnings under a strict liability theory also supports a conclusion that the Aim N Flame was not defective under a negligence theory. Indeed, as discussed above, Bartholic did

not need a warning to inform her that a butane lighter is dangerous when it falls into the hands of an unsupervised child. Moreover, the warnings provided by Scripto adequately informed consumers of the already obvious dangers associated with a product like the Aim N Flame. Accordingly, Scripto is entitled to summary judgment on the failure to warn prong of plaintiffs' negligence claim.

### 4. Consumer Product Safety Act Claims

In their amended complaint, plaintiffs allege that Scripto violated various provisions of the Consumer Product Safety Act by: (1) importing and distributing utility lighters that did not conform with the child-safety requirements set forth in 16 C.F.R. § 1210; and (2) failing to furnish information to the Consumer Product Safety Commission as required by 15 U.S.C.A. § 2064(b). (Am.Compl.¶ 63.) Scripto moves for summary judgment on the grounds that: (1) the regulations promulgated by the Consumer Product Safety Commission only apply to cigarette lighters and not utility lighters such as the Aim N Flame; and (2) there is no private right of action for violations of the Consumer Product Safety Act reporting requirement contained in 15 U.S.C.A. § 2064(b). (Def. Scripto's Br. at 13–18.) In their response brief, plaintiffs voluntarily abandoned these claims. (Pls.' Resp. at 3, 61.) Accordingly, I grant Scripto's summary-judgment motion with respect to plaintiff's Consumer Product Safety Act claims.

### 5. Punitive Damages

 In a diversity case, the award of punitive damages is a matter of state law. *Klein v. Grynberg,* 44 F.3d 1497, 1503 (10th Cir.1995) (citations omitted). Under Colorado law, punitive damages are available only pursuant to statute. *Grunt-*

*meir v. Mayrath Indus., Inc.,* 841 F.2d 1037, 1040 (10th Cir.1988) (citing *Kaitz v. District Court,* 650 P.2d 553 [Colo.1982] ). Colo.Rev.Stat. § 13–21–102(1)(a)–(b), in relevant part, provides:

(1)(a) In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. . . .

(b) As used in this section, "willful and wanton conduct" means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.

In order to recover punitive damages, the party requesting them must prove beyond a reasonable doubt that the statutory standards have been met. Colo.Rev.Stat. § 13–25–127(2) (1999); *Juarez v. United Farm Tools, Inc.,* 798 F.2d 1341, 1342 (10th Cir.1986) (citing *Tri–Aspen Constr. Co. v. Johnson,* 714 P.2d 484, 486 [Colo. 1986] ). "In cases properly involving punitive damages claims, it is within the province of the jury to determine the proper amount of punitive damages." *Alley v. Gubser Dev. Co.,* 785 F.2d 849, 855 (10th Cir.1986). "The question of the sufficiency of evidence to justify an award of exemplary damages, however, is a question of law for the court." *Id.* (citing *Mince v. Butters,* 616 P.2d 127, 129 [Colo. 1980] ).

Scripto contends that plaintiffs have failed to produce sufficient evidence to justify an award of punitive damages in this case. (Def. Scripto's Br. at 18–19.) In support of its argument, Scripto relies primarily upon *Alley* and *Juarez,* two Tenth Circuit decisions that reversed the award of punitive damages in products liability cases because the court found that the plaintiffs had failed to introduce sufficient evidence to support these awards. (*Id.*) In *Alley,* the plaintiffs sued several defendants involved in the manufacture and sale of plaintiffs' mobile home on a number of products liabilities theories. *Alley,* 785 F.2d at 850–51. According to the plaintiffs, the defendants' use of wood products containing formaldehyde in the construction of their mobile home was in wanton and reckless disregard of the their rights. *Id.* at 855. The jury found for the plaintiffs and awarded them both compensatory and punitive damages. In reversing the jury's award of punitive damages the Tenth Circuit held:

In submitting the issue of punitive damages to the jury, the district court would have to conclude that a reasonable jury could find that the industry's use of wood products containing formaldehyde is a wanton and reckless disregard of the plaintiffs' rights such that defendants knew or should have known it would probably cause the plaintiffs' injury. There is simply no evidence in the record to support such a finding. . . . The only evidence in the record to support such a finding consists of a few isolated consumer complaints regarding odors and minor irritation. This simply falls short of the evidence required to show that injury would probably result from defendants' conduct.

*Id.* at 856.

In *Juarez,* the Tenth Circuit reversed a jury verdict awarding an agricultural worker punitive damages against the manufacturer of a grain cart. *Juarez,* 798 F.2d at 1345. Although the court found that the evidence produced at trial showed beyond a reasonable doubt that there was a "substantial risk of harm" faced by users of grain carts and that "the defendant was

aware of this risk," the Tenth Circuit held that punitive damages were inappropriate because there was insufficient evidence to establish that the "defendant disregarded the consequences of the risk." *Id.* at 1343. Specifically, the court held that "[t]he warning [provided with the safety instructions to the cart] and the absence of any reports of other accidents persuade us that as a matter of law Juarez has not shown beyond a reasonable doubt that the defendant disregarded the consequence of the danger presented by the cart." *Id.* at 1344.

Like Scripto, plaintiffs also rely heavily on a Tenth Circuit case, *Gruntmeir*, to support their argument that there is sufficient evidence to support an award of punitive damages. (Pls.' Resp. at 59.) In *Gruntmeir*, the Tenth Circuit affirmed an award of punitive damages to a plaintiff in a products liability case who was injured when his arm got caught in an auger that had its safety shield removed. *Gruntmeir*, 841 F.2d at 1037. In affirming the trial court's decision to submit the punitive damages issue to the jury, the Tenth Circuit found that there was sufficient evidence in the record to support the plaintiff's claim that the defendant acted with wanton and reckless disregard of his rights based on: (1) the defendant's knowledge that users of the auger were like to remove the safety shield; (2) the availability of safer designs which were technologically feasible; (3) the defendant's desire to manufacture a less safe product because it was cheaper; and (4) the defendant's knowledge of numerous similar accidents over the years involving unshielded au-gers. *Id.* at 1040–41. Thus, the court concluded that this evidence was sufficient to demonstrate beyond a reasonable doubt that: (1) there was substantial risk of harm to users of the grain auger; (2) the defendant was aware of the risk; and (3) the defendant disregarded the consequences of this risk by continuing to market an auger with a safety shield that was likely to be removed. *Id.* at 1041.[10]

■ Although it is a very close question, I find that the evidence produced in the instant case aligns more closely with *Gruntmeir* than either *Alley* or *Juarez*. The evidence produced by plaintiffs, if believed by the trier of fact, demonstrates that: (1) the Aim N Flame as currently designed posed a substantial risk of harm due to child-play fires; (2) Scripto was aware of these risks and the need for child-resistant lighters; and (3) Scripto disregarded these risks and continued to market a non child-resistant Aim N Flame even though a child-resistant design was feasible. Indeed, Scripto concedes, at least for the purposes of this motion, that it received incident data from the Consumer Product Safety Commission regarding child-play fires involving the Aim N Flame dating back to 1987. (Pls.' Evidentiary Supp., Ashley I Dep. at 217.) Scripto also concedes that it had actual knowledge of child-play fires started with the Aim N Flame. (*Id.*, Ashley II Dep. at 318, Forys I Dep. at 229.) Moreover, and more importantly, Scripto's own disclosures to the Consumer Product Safety Commission reveal that, between 1992 and April 1996, Scripto was sued five times and received

---

10. In affirming the district court's decision to allow the punitive damages issue go to the jury, the court noted that it was mindful of its seemingly contradictory holdings in *Alley* and *Juarez*. *Id.* at 1040. In distinguishing these decisions, the court relied heavily upon the fact that the *Gruntmeir* plaintiff produced evidence of previous accidents and the defen-dant's knowledge of such accidents. *Id.* ("What distinguishes *Juarez* from the instant case is that in *Juarez*, 'the defendant had no indication that the warning [not to enter the grain cart while the auger was running] was ineffective, for Juarez concedes that there had been no reports of prior similar accidents.' ").

three insurance claims for reimbursement for personal injury and property damage for fires started by children playing with an Aim N Flame. (*Id.*, Ex. 138A [Letter and Accompanying Exhibits from Scripto to the Consumer Product Safety Commission (3/15/96) ].)

In addition, several of plaintiffs' experts testified that child-resistant technology was within the state of the art at the time of the Bartholic fire. Also, there is evidence in the record that, following a 1994 lawsuit, Scripto filed for a Japanese patent on a child-resistant design for the Aim N Flame and asked its engineering department to hurry plans for a child-proof design, and yet, despite this initial flurry of activity, Scripto did not begin testing a child-resistant model (which was covered by the 1994 patent) until January 1998. (*Id.* Ex. 277 [Mem. from K. Endo to Mr. M. Nita and Mr. Mori of 4/28/94], Mori Dep. at 126.) The record further provides evidence that the cost per unit of producing a child-resistant Aim N Flame was minimal. (*Id.*, Ex. 291 [Internal Scripto Mem. of 5/20/96].)

Based on the foregoing, a reasonable juror could conclude that Scripto's conduct rose to the level of willful and wanton within the meaning of Colo.Rev.Stat. § 13–21–102. Accordingly, Scripto's motion for summary judgment is denied with respect to its argument that plaintiffs have failed to produce evidence sufficient to sustain an award of punitive damages.[11]

■ Scripto next argues that it is entitled to summary judgment on the punitive damages issue because Scripto was reasonable in relying on adult supervision of utility lighter use in lieu of child-resistant measures as a matter of law. (Def. Scripto's Reply at 23–28.) Scripto asserts that, be-cause other courts have found that adults are in a better position than manufacturers to prevent child-play fires, its conduct here was a reasonable as a matter of law. (*Id.*) I find this argument unpersuasive for several reasons. First, in Colorado, the purpose in awarding punitive damages "is not to compensate an injured plaintiff, but to punish the defendant and deter others from similar conduct." *White v. Hansen,* 837 P.2d 1229, 1236 (Colo.1992) (citations omitted). To that end, the focus should be on the defendant's conduct, rather than that of the plaintiff. To accept Scripto's proposition would in effect shift the focus away from its knowledge and disregard of the dangers posed by the design of a product that it placed in the stream of commerce.

Second, the fact that other courts have found cigarette lighters not unreasonably dangerous is not dispositive of whether Scripto's reliance on adult supervision is reasonable as a matter of law. Indeed, the lighter cases that Scripto relies on for this proposition were decided solely under the consumer expectation test.[12] Scripto's argument completely ignores the litany of lighter cases decided under the risk-benefit test that hold the dangerousness of a lighter without child-resistant features is a matter for the jury. Thus, to accept Scripto's contention and find that Scripto's reliance on adult supervision was reasonable as a matter of law on the basis of judicial decisions from other jurisdictions applying different law would unduly infringe on Colorado's ability to determine what constitutes reasonable conduct under its own law. This is a finding that I am unwilling to make, especially where, as

---

**11.** Although plaintiffs' punitive damages claim survives for the moment, I will not hesitate to take this issue from the jury if plaintiffs fail to carry their burden at trial.

**12.** *See Todd,* 21 F.3d at 1404; *Kirk,* 16 F.3d at 708–09.

here, Scripto has not provided any Colorado authority that supports its position.

In sum, while the issue of adult supervision is definitely relevant to Scripto's substantive liability insofar as it factors into the risk-benefit test or provides a basis for an affirmative defense, I cannot conclude at this stage of the proceedings that it is a complete defense to punitive damages as a matter of law in Colorado. Rather, it is just another factor that the jury should consider in determining whether Scripto's conduct merits the award of punitive damages. Accordingly, Scripto's motion for summary judgment is denied with respect to the issue of punitive damages.

### 6. Conclusion

Based on the foregoing, it is therefore

ORDERED as follows:

1. Scripto's motion for summary judgment (# 59) is GRANTED in part and DENIED in part.

2. Scripto's motion is GRANTED with respect to plaintiffs' strict products liability claim to the extent that it is predicated on a failure to warn or provide adequate warnings regrading the dangers inherent to the Aim N Flame.

3. Scripto's motion is GRANTED with respect to plaintiffs' negligence claim to the extent that it is predicated on Scripto's failure to provide adequate warnings regarding the dangers inherent to the Aim N Flame.

4. Scripto's motion is GRANTED with respect to plaintiffs' Consumer Product Safety Act claim.

5. Scripto's motion is DENIED in all other respects.

6. The parties will appear in courtroom C–201 for a final pretrial conference at 11:00 o'clock a. m. on February 25, 2000. In preparing for the conference, the parties shall adhere to my Hearing, Conference and Trial Procedures.

## ORDER AND MEMORANDUM
## OF DECISION

This is a personal-injury case. Plaintiff Jerred Meskimen was severely injured when his three-year-old brother, Plaintiff Anthony Meskimen, lit his crib on fire with an "Aim N Flame" utility lighter which Defendant Scripto–Tokai Corporation ("Scripto") manufactures and distributes. Plaintiffs assert claims against Scripto for: (1) strict products liability; (2) negligence; and (3) violations of the Consumer Product Safety Act, 15 U.S.C.A. §§ 2051–2084 (West 1998). This matter is before the court on Scripto's "Motion to Vacate January 10, 2000, Order and Memorandum of Decision" filed September 22, 2000. In my January 10, 2000, Order and Memorandum of Decision, I granted in part and denied in part Scripto's motion for summary judgment. (*See* Order and Mem. of Decision at 31–32 [filed Jan. 10, 2000] [hereinafter "January 10, 2000, Order"].) Familiarity with that decision and the procedural posture of this case is assumed. On August 18, 2000, the parties reached a confidential settlement agreement which provides for the dismissal of all of plaintiffs' remaining claims against Scripto with prejudice. To facilitate the settlement, Scripto now requests that I vacate my January 10, 2000, Order. (Mot. to Vacate Jan. 10, 2000, Order and Mem. of Decision at 2–3 [filed Sept. 22, 2000] [hereinafter "Scripto's Mot."].) Although plaintiffs do not join Scripto's motion, they have agreed, as part of the settlement terms, not to file an opposition to Scripto's motion. (*See* Certificate of Compliance With D.C.Colo.L.R. 7.1[A] [filed Sept. 22, 2000].)

### ANALYSIS

#### 1. Standard for Vacatur

 The decision whether or not to vacate a previously issued decision is largely an equitable one which falls within

the discretion of the court. *Humphreys v. DEA*, 105 F.3d 112, 114 (3d Cir.1996). In *U.S. Bancorp Mortgage Company v. Bonner Mall Partnership*, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994), the Supreme Court rejected a per se rule that orders and judgments should be vacated in situations in which a case becomes moot during the litigation. The Court held that, while vacatur of moot cases may be appropriate in certain instances, it is not in others. *Id.* at 23, 115 S.Ct. at 390. For example, vacatur is appropriate where the case becomes moot by "happenstance"—"that is to say, where a controversy presented for review has 'become moot due to circumstances unattributable to any of the parties.'" *Id.* at 23, 115 S.Ct. at 390 (quoting *Karcher v. May*, 484 U.S. 72, 82, 83, 108 S.Ct. 388, 391, 98 L.Ed.2d 327 [1987] ). The Court held, however, that an order should not be vacated merely because the parties have rendered the case moot by entering into a settlement. *Id.* at 25, 115 S.Ct. at 392. In such a case, "the losing party has voluntarily forfeited his legal remedy by the ordinary process of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur. The judgment is not unreviewable, but simply unreviewed by [the party's] own choice." *Id.* at 29, 115 S.Ct. at 392. In those cases where mootness is the result of settlement, the Supreme Court has held that vacatur should rarely be granted. *Id.* at 29, 115 S.Ct. at 393; *see also Ringsby Truck Lines, Inc. v. Western Conference of Teamsters*, 686 F.2d 720, 722 (9th Cir.1982) (holding that appellant who moots his own appeal "is in no position to complain that his right of review of an adverse lower court judgment has been lost"). Rather, the determination of whether vacatur should be granted in such cases is "an equitable one, and exceptional circumstances may conceivably counsel in favor of such a course." *Id.* at 29, 115 S.Ct. at 393.

Here, Scripto urges me to vacate my January 10, 2000, Order because vacatur will facilitate settlement and will prejudice none of the parties insofar as Scripto was the prevailing party on three claims and no final adjudication has occurred as to the remaining claims. (Scripto's Mot. at 3.) Be that as it may, I nevertheless find that Scripto's motion falls far short of establishing the exceptional circumstances necessary to invoke the court's equitable power of vacatur. Indeed, the Supreme Court has made it clear that "exceptional circumstances do not include the mere fact that the settlement agreement provides for vacatur . . . ." *U.S. Bancorp Mortgage Co.*, 513 U.S. at 29, 115 S.Ct. at 393. Nor does raising the specter of judicial economy resulting from the facilitation of settlement, without more, present a persuasive justification for vacatur. *Id.* at 27–28, 115 S.Ct. at 393 ("[W]hile the availability of vacatur may facilitate settlement after the judgment under review has been rendered[,] . . . it may deter settlement at an earlier stage. Some litigants, at least, may think it worthwhile to roll the dice rather than settle in district court or in the court of appeals, if but only if, an unfavorable outcome can be washed away by a settlement-related vacatur."). Scripto, moreover, entirely fails to address how the public's interest would be furthered by vacatur. *Id.* at 26–27, 115 S.Ct. at 392 ("Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." [quotation marks and citations omitted] ).

Because Scripto has failed to establish any exceptional circumstances that would merit the invocation of this court's equitable powers, I conclude that vacatur of my January 10, 2000, Order is not warranted.

Accordingly, Scripto's motion to vacate is denied.

### 2. Conclusion

Based on the foregoing, it is therefore

ORDERED that Scripto's motion to vacate the court's January 10, 2000, Order is DENIED.

### ORDER ON MOTION FOR RECONSIDERATION

This matter is once again before the court on Defendant Scripto–Tokai Corporation's meritless and futile, but dogged, attempt to eat its cake and have it, too—by choosing to litigate this case until it received a decision which was not in all respects satisfactory to it, settling the case on the assumption that it could ask this court to vacate the decision, and now asking the court to revise parts of the decision which it evidently regards as especially intolerable. The formal procedural vehicle by which it seeks to accomplish this is "Defendant Scripto–Tokai Corporation's Unopposed Motion for Reconsideration/Clarification of the Order and Memorandum of Decision Dated January 10, 2000." The motion is without foundation in procedural or substantive law and ironically reflects an exalted view of this district court's decisions which not even the court itself entertains.

As the title of defendant's motion suggests, I filed with the clerk of court a long Order and Memorandum of Decision in this products liability case on January 10, 2000. That decision outlined the factual and legal reasons for my ruling partly granting and partly denying defendant's motion for summary judgment. I did not seek more extensive publication of that ruling (1) because the decision interpreted a number of substantive provisions of Colorado law as to which the published decisions of the state appellate courts are properly authoritative and (2) because I think the decision of a single district judge, binding on nobody but the parties and their privies and subject ultimately to further appellate scrutiny, should be published only on the rare occasion where there is public interest in the case or where publication would serve some purpose beyond adding to the books one more cacophonous opinion concerning the law. Because defendant's subsequent actions have called into question the reasoning of the January 10 decision, however, and because the motion now before the court cannot be fully understood without reference to that decision, I will now change my earlier predilection and publish the decision.

Several months after I filed the January 10 decision, the parties began to discuss settlement under the auspices of a magistrate judge. On August 30, the magistrate judge, reciting the parties' notification to him that the case had been settled, ordered them to file their settlement papers by October 30. The parties did not do so. Instead, defendant filed a motion to vacate the January 10 decision, acknowledging that the parties had reached a settlement on August 18, but claiming that the agreement allowed defendant to file the motion to vacate. The motion failed to mention the United States Supreme Court's controlling decision, *U.S. Bancorp Mortgage Company v. Bonner Mall Partnership,* 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

In an second unpublished Order and Memorandum of Decision filed October 11, I denied the motion to vacate, applying *Bonner Mall* and finding no exceptional circumstances which would justify vacatur. The parties apparently continued to squabble about settlement, as was evidenced by plaintiffs' October 30 motion to enforce the settlement agreement. It appeared that the parties had again resolved the case when, on November 17, plaintiffs filed a

request to withdraw their motion to enforce the settlement. On defendant's motion, the court extended until December 11 the deadline for submitting a stipulation or motion dismissing the case in light of the settlement. Once again, that deadline has been ignored, and defendant has instead filed the instant motion. Although defendant purports to submit the motion "without opposition," its papers clarify that plaintiffs "will not agree or stipulate to this motion, but, as a term of settlement, will not oppose it." In other words, I infer, plaintiffs just want their settlement and do not really care if defendant wishes to continue to flop about like a fish out of water.

■ The procedural prism for considering this motion, though unmentioned in defendant's submission, is well-established. Although the Federal Rules of Civil Procedure do not specifically recognize a motion for reconsideration, the court treats a motion for reconsideration filed more than ten days after the entry of judgment as one seeking relief from the judgment under rule 60(b) of the Federal Rules of Civil Procedure. *Hatfield v. Board of County Comm'rs for Converse County*, 52 F.3d 858, 861 (10th Cir.1995); *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.1991). Rule 60(b)(6) provides a catch-all provision which allows a court to reconsider a prior order for "any other reason justifying relief from the operation of the judgment." *See* Fed. R.Civ.P. 60(b)(6). Rule 60(b)(6) has been referred to as a "grand reservoir of equitable power to do justice in a particular case." *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1147 (10th Cir.1990) (citations omitted). A court, however, will only award relief under rule 60(b)(6) in extraordinary cases. *Id.* (citing *Ackermann v. United States*, 340 U.S. 193, 202, 71 S.Ct. 209, 213, 95 L.Ed. 207 [1950]). Thus, a motion to reconsider is not a second opportunity for the losing party to make its strongest case, to rehash arguments, or to

dress up arguments that previously failed. *See Voelkel v. General Motors Corp.*, 846 F.Supp. 1482, 1483 (D.Kan.1994), *aff'd*, 43 F.3d 1484, 1994 WL 708220 (10th Cir. 1994). Most importantly, a motion to reconsider is not a motion "to reargue those issues already considered when a party does not like the way the original motion was resolved." *In re Houbigant, Inc.*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

■ Here, the motion for reconsideration goes beyond the pale encircling most such motions. Defendant does not even quarrel with the resolution of its motion for summary judgment, aim to change the outcome, or otherwise ask the court to rule on live issues. Instead, it argues about language in the decision which "could be interpreted" as having an untoward specified effect, which alters or amends defendant's duty under Colorado law, or which could be read as deciding issues which should be resolved by a jury—all in a case which, by defendant's admission, has settled. If the case has settled, the January 10 decision is moot. Settlement has eliminated defendant's right to appeal and obviated any ill effect which an error might have caused the parties in this case. Beyond the parties, the upshot of the decision is speculative. It binds nobody. The *stare decisis* effect of such a district court decision has been characterized by Judge Posner as "modest—negligible, really . . . ." *Harris v. Board of Governors of the Federal Reserve System*, 938 F.2d 720, 723 (7th Cir.1991). If the decision is as ambiguous or wrong as defendant insists, other courts and litigants will undoubtedly afford it appropriate treatment. There is a time when every case must end, and that time has passed here. It is therefore

**ORDERED** as follows:

1. The referenced motion (# 140) is DENIED.

2. Within five days of the date of this order, the parties shall file a stipulation or motion for dismissal reflecting the acknowledged settlement of this case. Failure to do so may result in any appropriate sanction permitted by law.